STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v.
SAMUEL SHEFFIELD, DEFENDANT-RESPONDENT.

Argued February 20, 1973—Decided April 4, 1973.

*Mr. Francis J. Badach,* Assistant Prosecutor, argued the cause for appellant (*Mr. Joseph P. Lordi,* Essex County Prosecutor, attorney).

*Mr. Robert L. Martin,* Assistant Deputy Public Defender, argued the cause for respondent (*Mr. Stanley C. Van Ness,* Public Defender, attorney).

The opinion of the court was delivered by

SULLIVAN, J. This appeal involves the issue of whether a police officer has the right in appropriate circumstances to seek to question a person on the street about possible criminal behavior, even though the officer has no probable cause to make an arrest.

Defendant was convicted of the unlawful possession of heroin and was sentenced to two years probation and fined. On appeal, the Appellate Division reversed the conviction on the ground that defendant's pretrial motion to suppress the evidence consisting of 14 decks of heroin seized at the time of his arrest should have been granted. The court held that it did not find in the evidence adduced on the motion hearing "the existence of such 'highly suspicious' activities on defendant's part as would justify the police in stopping and questioning him in the manner that they did." We granted the State's petition for certification. 62 *N. J.* 188 (1972).

Since this case turns on the facts surrounding defendant's apprehension and the seizure of the 14 decks of heroin, a summary of the evidence presented at the hearing on the motion to suppress is in order.

The only witness called by the State was Detective Gordon El, a member of the Newark Narcotics Squad.

El testified that on February 2, 1971, at about 3:30 P.M., he was on duty with Detectives McNulty and Delaney. The officers were in an unmarked squad car and were wearing regular street clothes. While patrolling on 15th Avenue near Bruce Street in Newark, a narcotics area, El observed

defendant "a known narcotics' pusher and dealer" whom El had previously arrested on a narcotics charge and whom El described as "card carrying."* El had seen defendant in the area on some 40 occasions.

As the car approached defendant, who was walking along the street, El called him by name over to the car. Defendant did not respond and started to walk quickly in the opposite direction towards a tavern. (El said that defendant knew who the officers were.)

The officer got out of the car and went after defendant again calling him by name. When he was about two feet in back of defendant, El saw defendant put his right hand to his mouth. (El said that based on his experience on the narcotics squad defendant's gesture indicated he was attempting to conceal narcotics evidence.) Just as El caught up with defendant, defendant turned and pushed the detective away. El then attempted to arrest defendant for assault. A struggle ensued during the course of which defendant fell to the ground and 14 decks of heroin wrapped with a rubber band fell out of defendant's mouth.

On cross-examination El clarified his testimony about having previously arrested defendant on a narcotics charge by admitting that he had not arrested defendant himself, but had been present when defendant was arrested by another officer.

Defendant did not testify. The only evidence he offered was his arrest record maintained by the Newark Police Department. This record did not show a prior narcotics arrest.

The trial court found it unnecessary to decide whether Detective El was mistaken in his testimony as to defendant's prior narcotics arrest or whether the Newark arrest record was not complete. The court was satisfied that defendant was known to the officer who, under the circum-

---

*See *N. J. S. A.* 2A:169A–1 *et seq.* Repealed *L.* 1971, *c.* 231 § 1. Eff. June 23, 1971.

stances, had the right to question defendant and when defendant turned away and made a gesture to his mouth the officer had probable cause to suspect criminal activity on defendant's part.

As heretofore noted, the Appellate Division held that the circumstances were not such as to justify the police attempt to stop and question defendant. Accordingly, it ordered the heroin evidence suppressed, apparently on the basis it was the "fruit" of illegal police action. *Wong Sun v. United States,* 371 *U. S.* 471, 83 S. Ct. 407, 9 *L. Ed.* 2d 441 (1963).

■ We disagree. A narcotics officer is especially qualified to detect traffic in narcotic drugs. He learns through experience how to spot an addict or pusher, how an addict or pusher acts and reacts, and where the areas of narcotics activity are. When an officer applies his expertise in a narcotics situation, it should not be given grudging recognition when assaying the existence of cause to take police action.

Here the trial court's findings were supported by credible proofs. It accepted Detective El's testimony that he knew defendant. This was a narcotics area. El had seen defendant in the area on some 40 prior occasions. Defendant was a known narcotics pusher and dealer according to the officer. While the record does not indicate why El called defendant over to the car, it is reasonable to assume that he wanted to question defendant on the subject of narcotics. In view of defendant's known background, this was not unreasonable police action. There was no indication that defendant was to be detained.

Defendant responded to being called by name by walking rapidly away. The officer said that defendant knew who the officers were. This is confirmed by defendant's own conduct, his walking away and the actual placing of the heroin in his mouth. This furtive attempt to conceal the drug supports El's testimony that defendant knew the men in the car were police officers.

After defendant started walking away El got out of the car and went after him. It was while El was trying to catch up with defendant that the officer saw him make a gesture to his mouth with his right hand. Defendant was not under any kind of police restraint at the time this act, highly suspicious to the experienced narcotics officer, was committed by defendant. At this point El had probable cause to arrest defendant. However, as we have mentioned above, the officer did not attempt to make an arrest until after defendant turned and pushed the officer away.

This is not a stop-and-frisk situation such as was considered in *State v. Dilley*, 49 *N. J.* 460 (1967). As far as the record shows the officer intended merely to question defendant. There is nothing illegal in this. The concurring opinion of Mr. Justice White in *Terry v. Ohio*, 392 *U. S.* 1, 34, 88 S. Ct. 1868, 1886, 20 *L. Ed.* 2d 889, 913 (1968), also a stop-and-frisk case, states:

"There is nothing in the Constitution which prevents a policeman from addressing questions to anyone on the streets. * * * Of course, the person stopped is not obliged to answer, answers may not be compelled, and refusal to answer furnishes no basis for an arrest, although it may alert the officer to the need for continued observation."

■ ■ The Appellate Division went wide of the mark when it limited the right of a police officer to question a person to a situation involving "highly suspicious activities." A police officer charged with the duty of crime prevention and detection and protection of the public safety must deal with a rich diversity of street encounters with citizens. In a given situation, even though a citizen's behavior does not reach the level of "highly suspicious activities," the officer's experience may indicate that some investigation is in order. Depending on the circumstances, street interrogation may be most reasonable and proper. *Adams v. Williams*, 407 *U. S.* 143, 92 S. Ct. 1921, 32 *L. Ed.* 2d 612, 616–617 (1972).

This is not to say that a court, while recognizing the need for effective crime prevention and detection, should not be vigilant to strike down an abuse of the street questioning of a citizen by the police. However, there is no indication that the conduct of the officer in attempting to question defendant was overbearing or harassing in nature. As noted in the majority opinion in *Terry v. Ohio, supra,* 392 *U. S.* at 22, 88 S. Ct. at 1880, 20 *L. Ed.* 2d 906–907.

"* * * a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest."

■■ The dissent herein is bottomed on the assumption that field interrogation by a police officer usually involves a "detention" of the person and has Fourth Amendment implications. The dissent, therefore, would limit such interrogation to a situation where the officer has "a reasonable suspicion of criminal activity." This would practically require an officer to have grounds for an arrest before he could interrogate a person on the street, a test specifically rejected by the Supreme Court in *Terry*. Our conclusion is that mere field interrogation, without more, by a police officer does not involve "detention" in the constitutional sense so long as the officer does not deny the individual the right to move. Nor, if the dissent so intends, could we accept the view that whenever a police officer, without some suspicion of criminal activity, approaches an individual to ask him a question, there is a constitutional wrong which would require the suppression of contraband which the individual discards in response to the approach of the officer.

■ We conclude that there was nothing improper in Detective El's seeking to question defendant. Defendant's furtive conduct thereafter, including his motion towards his mouth, gave El probable cause to suspect criminal activity on defendant's part. The resultant seizure of the 14

decks of heroin after it fell out of defendant's mouth was not the "fruit" of illegal police activity.

The judgment of the Appellate Division is reversed and the judgment of conviction is hereby reinstated.

CONFORD, P. J. A. D., Temporarily Assigned (dissenting). I hold the view that the Appellate Division was correct in reversing the defendant's conviction on the ground that the attempt of the police to detain defendant for questioning was invalid under the circumstances and that the motion to suppress should therefore have been granted.

A review of the proofs at the suppression hearing culled from the direct and cross-examination of Detective El, the sole witness for the State, will set the legal questions involved in perspective. El and two other detectives were in plainclothes riding in an unmarked police car when they approached defendant standing on a street corner. On direct examination El testified that "we" had had "several dealings" with defendant who was "a known narcotics pusher in the area". He also later said defendant was a "card carrier". There is nothing in the record to indicate that El based these characterizations on anything other than the "arrests" to which he alluded in his testimony. El said he had "personally" arrested defendant for possession of narcotics but he could not remember how many times.

El called out to the defendant to come to the car, but defendant walked away rapidly "in the opposite direction". According to El, defendant knew the officers. Thereupon El got out of the car and called defendant again, but the latter kept going. El proceeded after him and saw, from behind defendant's back, his "arm go up in a gesture * * * in what I should say is at an angle toward the mouth". When El caught up with defendant the latter pushed him away. "A struggle ensued", they fell down, and 14 bags of heroin fell from the defendant's mouth.

On questioning by the motion judge El modified his story as to arrests of defendant to say he had personally

arrested him once for narcotics but had seen him at police headquarters on three other occasions in the process of arrests by others for the same type of offense, El having been in "on the case" in each instance.

At an adjourned session of the hearing three weeks later, on further cross-examination, El retreated still further on the subject of defendant's arrests to admit he had never arrested the defendant but had on a single occasion, about a year or eighteen months before the event here in question, been in defendant's presence while he was being arrested on a narcotics charge. He said, however, he had seen defendant in the area of the instant encounter about 40 times since that arrest, but had on no such occasion seen him in possession of narcotics.

Defendant thereupon produced the custodian of records from Newark Police Headquarters who submitted defendant's arrest sheet. This showed no arrests of defendant whatever for narcotics offenses but four arrests on other kinds of charges (once only as a material witness), the latest in 1958, for non-support. The State made no effort to impugn the accuracy of this record in any way. It was of course entitled to the presumption of regularity as an official public record. *McCormick, Evidence* (1954) § 309, p. 641.

The trial court found the officer's actions justified by reason of defendant's refusal to submit to questioning and his "gesture" toward his mouth which "alerted" the officer in view of the "highly narcotic area".

In assaying the legality of the intrusion of the police upon defendant, we begin with the assurance of the Supreme Court in *Terry v. Ohio,* 392 *U. S.* 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), that the Fourth Amendment right of "personal security" applies to a person on the street as well as to people in their homes (p. 9, 88 S. Ct. 1868, 1873); that every individual is entitled "to the possession and control of his own person, free from all restraint or interference of others, unless by clear and un-

questionable authority of law". *Ibid.* "It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person", in a Fourth Amendment sense (p. 16, 88 S. Ct. 1868, 1877).

However, it has justifiably been assumed, long before *Terry,* that circumstances of reasonable suspicion of criminal involvement, short of a situation amounting to probable cause to arrest, warrant a brief investigatory detention of a person abroad on the streets, even against his will. (If the individual is willing to be questioned, it is appropriate for the officer to do so regardless of whether there are suspicious circumstances.) See the authorities collected in Commentary to § 110.2 of the American Law Institute's *Model Code of Pre-Arraignment Procedure* (Proposed Official Draft No. 1, April 10, 1972; approved by the Institute in May 1972), p. 106, n. 6 (hereinafter referred to as "Pre-Arraignment Code"); and see *State v. Dilley,* 49 *N. J.* 460, 464 (1967); *State v. Taylor,* 81 *N. J. Super.* 296, 313 (App. Div. 1963). The critical question is as to the degree of suspiciousness of the activity justifying such detention. The closest the Supreme Court has yet come to a definition of the standard is the criterion expressed in *Terry,* where the court had to deal with both the right to stop and the right to pat down for weapons ("frisk"). The second exigency was described as being "where [the officer] has reason to believe that he is dealing with an armed and dangerous individual", regardless of probable cause (392 *U. S.* at 27, 88 S. Ct. at 1883). The first was described as where "a police officer observes unusual conduct which leads him reasonably to conclude in the light of his experience that criminal activity may be afoot" (392 *U. S.* at 30, 88 S. Ct. at 1884). Speaking in the context of a more general situation, however, the court said that "* * * in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken

together with rational inferences from those facts, reasonably warrant that intrusion" (*Id.,* at 21, 88 S. Ct. at 1880). Detention based upon "nothing more substantial than inarticulate hunches" is impermissible (*Id.,* at 22, 88 S. Ct. at 1880).

The quotation in the instant majority opinion from the concurring opinion of Justice White in *Terry* must be read in the context of that judge's additional comment, in the same quoted passage: *"Absent special circumstances* the person approached [by the police] may not be detained or frisked, but may refuse to cooperate and go on his way". (392 *U. S.* at 34, 88 S. Ct. at 1886) (Emphasis added). This is, of course, consistent with the view implicit in the opinion of the Chief Justice in *Terry* that the "special circumstances" adverted to by Justice White as a condition for involuntary detention be such as to raise at least reasonable suspicion of criminal activity.

In *Adams v. Williams,* 407 *U. S.* 143, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972), cited by the majority, the court cited *Terry* with approval, and held justified an intrusion (frisk) on an individual who a police officer was reliably informed was sitting in a car at 2:30 A.M. with narcotics and a gun on his person. Those circumstances are plainly not comparable with those here.

In the comprehensive treatment of this entire subject by Justice Jacobs in *State v. Dilley, supra,* the reference to "highly suspicious circumstances" was made twice, each time in reference to the question whether the officer there involved was justified in stopping the suspect in that case for summary inquiry (49 *N. J.,* at 464, 468); not, as the majority opinion implies, in reference to those justifying a frisk. The subject of frisk was treated separately (pp. 468–470), the court specifying the criterion therefor as being "when the situation urgently points to the need of such action for the officer's self-protection". (*Id.* at 468).

After an intensive six-year study of the entire subject of pre-arraignment procedure the American Law Institute

in 1972 proposed in its Pre-Arraignment Code, *op. cit. supra,* as the appropriate criterion for an involuntary investigatory stop that the suspect "is observed in circumstances such that the officer reasonably suspects that he has just committed, is committing, or is about to commit a misdemeanor or felony, involving danger of forcible injury to persons or of appropriation of or damage to property; * * *." Code § 110.2(1)(a)(i).[1] Statutes calling for the same criterion of reasonable suspicion or the like as the basis for an involuntary investigatory "stop" have recently been adopted in a number of states. Examples are: N. Y. Crim. Proc. Law 140.50 (1971) McKinney's Consol. Laws, c. 11–A; Ill. Ann. Stat. *ch.* 38, §§ 107–14 and 108–1.01 (1968). Others are cited in Appendix I of Pre-Arraignment Code, *op. cit. supra* at 231–33. In similar tenor is the Uniform Arrest Act, § 2(1); see Warner, "The Uniform Arrest Act", 28 *Va. L. Rev.* 315, 344 (1942).

It seems to me that the Pre-Arraignment Code formulation of reasonable suspicion of criminal activity is fairly declaratory of existing constitutional law on the question under consideration (excluding the Code limitation to crimes against person or property), and I would apply it here. That approach is entirely consistent with *State v. Dilley, supra,* as I read it.

Reading the instant transcript, as is absolutely necessary on judicial review of a search or seizure question, with dis-

---

[1]There follows in the Code section cited the conjunctive requirement of reasonable necessity to obtain or verify the identification of the person or an account of his conduct or to determine whether to arrest him. Stopping is also authorized, under (b), of potential witnesses of such offenses; and, under (c), of suspects sought for certain previously committed crimes.

The limitation in the Code of suspect crimes to those of injury to persons or appropriation of or injury to property was decided upon for several reasons, one of which was to exclude narcotics offenses. One reason advanced for the latter decision was the risk, in a stop and frisk of narcotics suspects, of abusing the occasion by "searching for contraband". (Frisk for weapons is allowed under § 110.2(4)). Commentary, *op. cit. supra*, p. 118.

regard for the hindsight knowledge that defendant was in fact a narcotics handler, and giving Officer El's testimony as much credibility as it deserves in the light of its impairment on cross-examination and rebuttal on the issue of prior alleged arrests of defendant by El (or anyone else), I find no credible basis in the proofs for *reasonable* suspicion by the police of any narcotics activity on the part of defendant when he was approached by the officers. On a record which, in my view, compels the finding that defendant was never before arrested (much less convicted) for narcotics activity or ever found with narcotics on him by El, who had seen him on the street in the area forty times in a year and a half, defendant was not a person who, at the time of the inception of the encounter, the police were entitled to detain for questioning against his will. There was no reasonable basis for suspicion of his then implication in any kind of narcotics activity. On what can here be believed, the police had no more than an "inarticulate hunch" (*Terry, supra,* 392 *U. S.* at 22, 88 S. Ct. 1868) that defendant was in some possible way involved in narcotics activity. This was insufficient for an involuntary detention under United States Supreme Court standards, which control us.

Defendant unequivocally manifested his unwillingness to be detained for questioning when he walked away from the police notwithstanding being called after by them twice. I would find, were the issue of timing critical, that *before* defendant made the alleged arm movement toward his mouth Detective El had embarked, to defendant's reasonable apprehension, on an effort to detain him for questioning, even if only briefly. The physical encounter corroborates such objectively manifested intent on El's part and defendant's unwillingness to be detained for questioning. I conclude, for the reasons already stated, that El had no legal right to make that attempt, as against defendant's right of freedom from unreasonable intrusion on his person, and that the subsequent train of events was a prox-

imate result of El's initiative. The discovery of the narcotics having resulted therefrom, it was excludable from evidence as its "fruit" under *Wong Sun v. United States,* 371 *U. S.* 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963).

Even assuming, however, that El's manifested intent to detain defendant for questioning did not arise until after the alleged arm movement toward defendant's mouth, there still was no reasonable basis to suspect him of ongoing narcotics activity. The significance of that gesture has to be adjudged against a compelled fact-finding on this record of no past "articulable" narcotics activity by defendant of any nature. Also, of course, the actual later discovery of narcotics is to be disregarded for purposes of the appraisal *a priori.* So viewed, the gesture was quite innocuous, and it did not become *per se* sinister because the area was one of high narcotics activity. It did not make for a case of "reasonable suspicion" where such did not exist before.

Out of a perhaps unnecessary excess of caution, I state my joinder in the general sense of Justice Jacobs' remarks in *State v. Dilley, supra,* concerning the judicial necessity, in these police-citizen street encounter cases, of striking "a balance between the interests of the individual in being free from police interference and the interests of society in effective law enforcement". (49 *N. J.* at 468). I would, however, supplement the *Dilley* observations to add that not only the individual but society itself has an "interest" in freedom of individuals, generally, from unreasonable police intrusions, paralleling its interest in effective law enforcement.[2] We are, after all, dealing with the viability of a valued provision of the Bill of Rights.

---

[2]The Commentary to § 110.2 of the Pre-Arraignment Code, *op. cit. supra,* observes (pp. 113–14) : "\* \* \* there is the danger that the stop is susceptible of abuse. It may be used not for its authorized purpose but to harass persons to whom the police may be hostile or about whom they feel a generalized suspicion or apprehension—

The occasion for appellate judicial assessment of parameters of reasonableness is unfortunately confined, as in the present instance, practically exclusively to situations of after-the-fact known guilty persons already convicted as such. Cases involving unreasonable police intrusion on the innocent almost never get to court. These circumstances place the courts under the sensitive obligation of appraisal of the cases which do come before them in such a way as to furnish guidelines to police officers in the field which will assure a minimum of unreasonable interference with the privacy of the guiltless public while at the same time allowing for the reasonable latitude necessary for criminal law enforcement. However, as pointed out by Justice Jacobs in *State v. Macri,* 39 *N. J.* 250, 266 (1963), the inevitable price of that approach is that "the guilty occasionally go unpunished". This is tolerated "as the incidental cost of insuring the continued effectiveness of the guaranties afforded by the Constitution to all of us as free men". (*Ibid.*)

*For reversal*—Chief Justice WEINTRAUB, Justices JACOBS, PROCTOR, HALL, MOUNTAIN and SULLIVAN—6.

*For affirmance*—Judge CONFORD—1.

---

*e. g.,* youths, unconventionally attired persons, Negroes in white areas, whites in Negro areas", citing "The Police and the Community, A Report of a Research Study Submitted to the President's Commission on Law Enforcement and Administration of Justice (1966)."