665 A.2d 793

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. SARAH RICCARDI, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted September 27, 1995—Decided October 19, 1995.

Before Judges BAIME, VILLANUEVA and KIMMELMAN.

*Philip M. Saginario,* attorney for appellant.

*Charles R. Buckley,* Deputy Attorney General, Acting Bergen County Prosecutor, attorney for respondent (*Susan W. Sciacca,* Special Deputy Attorney General, Acting Assistant Prosecutor, of counsel and on the brief).

The opinion of the court was delivered by

BAIME, J.A.D.

A Bergen County grand jury charged defendant along with Hector Matias, Eddie Rosario and Jaime Negroni with distributing between one-half ounce and five ounces of cocaine (*N.J.S.A.* 2C:35–5a(1) and 5b(2)), distributing cocaine in a school zone (*N.J.S.A.* 2C:35–5a and –7), possession of cocaine (*N.J.S.A.* 2C:35–10a(1)), possession with intent to distribute over five ounces of cocaine (*N.J.S.A.* 2C:35–5a(1) and 5b(1)), possession of the same drug with intent to distribute in a school zone (*N.J.S.A.* 2C:35–5a and –7), possession of the same drug (*N.J.S.A.* 2C:35–10a(1)) and conspiracy to violate the Comprehensive Drug Reform Act (*N.J.S.A.* 2C:5–2 and *N.J.S.A.* 2C:35–1). The indictment also charged Rosario and Negroni with other crimes. Matias was convicted on several of the counts in a separate trial. Rosario then pled guilty and agreed to testify against his codefendants. Following a protracted trial, defendant was found guilty of conspiracy but was acquitted of the remaining charges. Negroni was convicted on several of the counts and was acquitted on others. After denying defendant's motion for a judgment of acquittal, the trial judge imposed a custodial term of five years.

Defendant appeals, contending (1) the trial judge erroneously refused to instruct the jury in accordance with defendant's requests to charge on statutory entrapment, (2) due process entrapment was established as a matter of law, and (3) the trial judge erred by propounding special interrogatories to the jury in the verdict sheet. We find no merit in these arguments and affirm defendant's conviction.

We need not recount the facts at length. Investigator Edward DiMaggio of the Bergen County Narcotics Task Force first met defendant while purchasing ice cream at a Dairy Queen she owned. The two engaged in conversation for approximately twenty minutes. Defendant asked numerous personal questions concerning DiMaggio's employment and marital status. Although the investigator had no reason to suspect defendant of criminal activity, in order to protect his undercover status, he claimed that he had just flown to New Jersey from Florida where he had left his girlfriend. DiMaggio added that he had not worked in a long time. Defendant pointedly asked DiMaggio why he had left Florida in "such a hurry." The nature of defendant's inquiry raised suspicions in DiMaggio's mind, but, after accepting her business card, the investigator made no further effort to continue the conversation.

Approximately a week later, however, DiMaggio telephoned defendant. In the course of their conversation, defendant repeated her questions regarding DiMaggio's lack of employment and ultimately asked him whether he was a drug dealer. DiMaggio explained that he had sold cocaine in Miami, but had no supplies or connections in New Jersey. Defendant then offered to assist DiMaggio in obtaining a supplier.

Defendant later introduced DiMaggio to Rosario. The three met at the Dairy Queen where they discussed purchasing varying amounts of cocaine. There followed a series of transactions in which DiMaggio and other members of the narcotics task force purchased increasingly large amounts of cocaine from Rosario, Matias and Negroni. Rosario testified at trial that defendant

asked him what she would receive from the first deal. Although Rosario promised to give defendant cocaine, he never delivered, choosing to share the profits with Matias and Negroni instead.

Arrangements were made for DiMaggio to purchase a full kilo of cocaine. However, defendant learned that the BMW driven by DiMaggio was listed as "not on file" with the Division of Motor Vehicles. She also found that a telephone number given by one of the agents who had accompanied DiMaggio, Michael Rodriguez, belonged to the Bergen County Narcotics Task Force. Defendant immediately confronted DiMaggio with what she had learned, and the two agreed to meet at the Dairy Queen.

Lieutenant John Quigley, posing as a member of DiMaggio's drug network, accompanied DiMaggio to the meeting. In order to shift suspicion from themselves, Quigley and DiMaggio told defendant they suspected Rodriguez was either a police officer or an informant. Although defendant expressed concerns about being arrested and jeopardizing her suppliers, Quigley and DiMaggio apparently managed to alleviate her suspicions.

On the next day, Quigley met alone with defendant to discuss the purchase of the kilo. Although defendant appeared apprehensive, she discussed the price of the cocaine and how much money she wanted for her role in the transaction. She specifically demanded $2,500 and a quantity of cocaine for her personal use. In later meetings with defendant, Quigley explained that he had phased DiMaggio out of the transaction because of DiMaggio's friendship with Rodriguez. He subsequently showed defendant a briefcase containing $30,500. After seeing the money, defendant, in Quigley's presence, telephoned Rosario and arranged for the sale of the cocaine. Defendant was later given a "sample" of the kilo.

Arrests were made when Rosario, Matias, and Negroni attempted to deliver the cocaine to Quigley. The investigators retrieved a knapsack containing over two pounds of the drug. In an oral statement later given to the police, defendant admitted her role in the conspiracy.

Defendant at trial did not contest most of the State's evidence, but relied instead on the defense of entrapment. She claimed that she had been seduced by DiMaggio, who ultimately persuaded her to introduce him to a drug supplier. According to her testimony, she had never sold drugs, but knew at least one dealer who had previously supplied her with cocaine. Defendant claimed that she reluctantly participated in the drug transaction because she was "romantically involved" with DiMaggio, who repeatedly assured her she was blameless.

It is against this factual backdrop that we consider defendant's arguments.

## I.

We reject defendant's claim that the trial judge committed reversible error when he refused to instruct the jury in accordance with the requests to charge submitted by the defense. We have carefully examined the trial judge's jury instructions, which tracked the model charge on entrapment. We find no error capable of producing an unjust result.

In several recent decisions, our Supreme Court has traced the evolution of New Jersey law dealing with entrapment. We see no need to tread upon ground so exhaustively covered in *State v. Florez*, 134 *N.J.* 570, 636 *A.*2d 1040 (1994), *State v. Fogarty*, 128 *N.J.* 59, 607 *A.*2d 624 (1992), and *State v. Johnson*, 127 *N.J.* 458, 606 *A.*2d 315 (1992). Suffice it to say, New Jersey law recognizes both statutory entrapment and due process entrapment. Under the Code of Criminal Justice, entrapment is an affirmative defense which the defendant must prove by a preponderance of the evidence. *State v. Florez*, 134 *N.J.* at 583, 636 *A.*2d 1040. The statutory defense, *N.J.S.A.* 2C:2–12, has both subjective and objective elements. *State v. Rockholt*, 96 *N.J.* 570, 579, 476 *A.*2d 1236 (1994). "Subjective entrapment occurs when the police implant a criminal plan in the mind of an innocent person who would not ordinarily have committed the offense." *State v. Florez*, 134 *N.J.* at 583–84, 636 *A.*2d 1040. Objective entrapment

takes place when the police conduct "is so egregious as to 'impugn the integrity of the court' " permitting a conviction or "causes an average citizen to commit a crime." *Id.* at 584, 636 *A.*2d 1040 (quoting *State v. Fogarty,* 128 *N.J.* at 65, 607 *A.*2d 624). "The statutory entrapment defense based upon both subjective and objective elements is an issue that the jury must determine." *Ibid.*

In contrast, due process entrapment focuses exclusively on government conduct. *State v. Johnson,* 127 *N.J.* at 470, 606 *A.*2d 315. Due process entrapment occurs when government conduct is "patently wrongful in that it constitutes an abuse of lawful power, perverts the proper role of government, and offends principles of fundamental fairness." *Id.* at 473, 606 *A.*2d 315; *see generally State v. Talbot,* 71 *N.J.* 160, 364 *A.*2d 9 (1976). Due process entrapment poses an issue of law that must be decided by the court. *State v. Florez,* 134 *N.J.* at 584,. 636 *A.*2d 1040.

The trial judge's instructions on statutory entrapment clearly apprised the jury of the subjective and objective elements required by *N.J.S.A.* 2C:2–12. Although the judge's instructions did not follow defendant's requests to charge word for word, the essential legal requisites of the defense were plainly conveyed to the jury. Indeed, in some respects the charge as given was overly favorable to the defense. For example, the judge told the jury the State bears the burden of proving defendant's predisposition to commit the crime "beyond a reasonable doubt." This instruction is wrong because it tends to fragment the requisites of the defense and dilutes the defendant's statutory duty to establish entrapment by a preponderance of the evidence. *N.J.S.A.* 2C:2–12b.

In any event, the only principle contained in defendant's requests that was not arguably conveyed to the jury pertains to a guideline adopted by the Federal Bureau of Investigation which bars an officer from offering to a suspect an inducement to commit a crime unless there is reasonable indication the subject is predisposed to commit the offense. The United States Supreme Court

referred to the guideline in *Jacobson v. United States*, 503 *U.S.* 540, 549 n. 2, 112 *S.Ct.* 1535, 1540, 118 *L.Ed.*2d 174, 184 (1992). There, the Court said that a defendant's predisposition must exist prior to the defendant's "being approached by Government agents." *Id.* at 549, 112 *S.Ct.* at 1540, 118 *L.Ed.*2d at 184. Our Supreme Court has similarly stated in the context of due process entrapment that the "police should ordinarily have a reasonable suspicion that the targeted defendant would be likely to engage in the commission of the crime contemplated." *State v. Florez*, 134 *N.J.* at 587, 636 *A.*2d 1040; *see also State v. Johnson*, 127 *N.J.* at 475, 606 *A.*2d 315.

We do not read these opinions as requiring that the police must have evidence of a defendant's predisposition before they ever seek to contact him. The courts have never required that law enforcement officers have a reasonable suspicion of criminal activity before commencing an investigation. To the contrary, we have long recognized that "[t]he police officer's duties include vital preventive roles." *State v. Dilley*, 49 *N.J.* 460, 464, 231 *A.*2d 353 (1967). In other contexts, it has been said that the police do not violate constitutional principles by " 'merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering as evidence in a criminal prosecution his voluntary answers to such questions.' " *State v. Davis*, 104 *N.J.* 490, 497, 517 *A.*2d 859 (1986) (quoting *Florida v. Royer*, 460 *U.S.* 491, 497, 103 *S.Ct.* 1319, 1324, 75 *L.Ed.*2d 229, 236 (1983)). *See also State v. Sheffield*, 62 *N.J.* 441, 447, 303 *A.*2d 68, *cert. denied*, 414 *U.S.* 876, 94 *S.Ct.* 83, 38 *L.Ed.*2d 121 (1973). There are a myriad of daily street encounters between citizens and police which are initiated by the police for a wide variety of purposes. We know of no constitutional requirement that all such encounters must be preceded by a reasonable suspicion that criminal activity is afoot.

It is certainly reasonable to require law enforcement officers to have some reasonable suspicion that a citizen is predisposed to

commit a crime before offering that citizen an inducement to participate in a criminal venture. It is far different to suggest that law enforcement officers may not even approach a citizen to determine whether such a predisposition exists without first harboring a reasonable suspicion of the citizen's criminal inclination. There is a distinction between "government conduct that merely highlights the temptation of the crime itself" and government conduct that threatens, coerces, or induces a person into committing criminal activity. *Jacobson v. United States,* 503 *U.S.* at 558, 112 *S.Ct.* at 1545, 118 *L.Ed.*2d at 190 (O'Connor, J., dissenting).

■ In this case, for example, no evidence was presented that DiMaggio offered defendant an inducement to commit a crime before she expressed an interest in drug activity. Although DiMaggio had no hard evidence that defendant was involved in the drug trade before telephoning her, defendant's subsequent statements clearly raised a reasonable suspicion that she was so inclined. Thus, the trial judge did not err by refusing to charge the jury that a police officer may not offer a citizen an inducement to commit a crime without having first a reasonable suspicion of the targeted defendant's predisposition. The evidence did not support such an instruction.

We add that even if we are incorrect regarding the distinction we have drawn, we would not reverse defendant's conviction in light of the strong evidence of defendant's guilt. We would find any error harmless beyond a reasonable doubt.

## II.

■ We find no basis to disturb the trial judge's denial of defendant's post-verdict motion for a judgment of acquittal. The record does not support defendant's claim of due process entrapment. In reaching this conclusion, we have applied the factors enunciated in *State v. Johnson,* 127 *N.J.* at 474, 606 *A.*2d 315. The defense was disproved by clear and convincing evidence. *State v. Florez,* 134 *N.J.* at 590–91, 636 *A.*2d 1040. While defendant's claim that she was seduced by DiMaggio is indeed disturb-

ing, it was not substantiated by the evidence presented at trial. We note that defendant's testimony on this point was riddled with contradictions and inconsistencies and was not corroborated by independent proofs. Moreover, defendant continued to participate in the conspiracy long after DiMaggio's role ended. It cannot fairly be said that due process entrapment was established as a matter of law.

## III.

We quickly dispose of defendant's contention that the trial judge erred by submitting special interrogatories to the jury. The short answer to this argument is that the verdict sheet does not contain special interrogatories. Rather, it lists each count of the indictment and specifies the date, place and crime alleged, followed by spaces for the jury to check "not guilty" or "guilty," and blanks for the amount of the cocaine where gradation is in issue. The verdict sheet fully complied with *R.* 3:19–1(b).

The singular vice of special interrogatories "is their potential for destroying the ability of the jury to deliberate upon the issue of guilt or innocence free of extraneous influences." *State v. Simon,* 79 *N.J.* 191, 199, 398 *A.*2d 861 (1979). Special interrogatories "can constitute a form of mental conditioning which is antithetical to the untrammeled functioning of the jury." *Id.* at 200, 398 *A.*2d 861.

Here, the verdict sheet did not have the capacity to proselytize the jury to the guilt of the defendant. Nor did it have the potential for perverting the jury's deliberative processes by encroaching upon its freedom in structuring its inquiry. As we noted earlier, the trial was a lengthy one, and the indictment had multiple counts. It would have been extremely difficult for the jury to have deliberated without specific references to the charges, dates and locations alleged. The trial judge did not abuse his discretion.

■ We note one further point before leaving the subject. Defendant contends that the verdict sheet should have contained a specific reference to the defense of entrapment. "Not guilty by reason of entrapment" is not a separate verdict, since, unlike a finding of "not guilty by reason of insanity," it has no independent consequences. *See N.J.S.A.* 2C:4–8; *R.* 3:19–2. We find no error in the trial judge's failure to make specific reference to the defense of entrapment in the verdict sheet. *See State v. Florez,* 134 *N.J.* 570, 591, 636 *A.*2d 1040 (1994).

Affirmed.