# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4896-17T2

STATE IN THE INTEREST
OF N.H.,

     A Juvenile.

_____

Submitted October 7, 2019 – Decided January 15, 2020

Before Judges Fasciale and Moynihan.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FJ-07-0653-18.

Joseph E. Krakora, Public Defender, attorney for appellant N.H. (Brian P. Keenan, Assistant Deputy Public Defender, of counsel and on the brief).

Theodore N. Stephens II, Acting Essex County Prosecutor, attorney for respondent State of New Jersey (Lucille M. Rosano, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

    N.H. appeals from the family court's order adjudicating him a delinquent.

He argues the court erred when it denied his motion to suppress a handgun found

after a detective ordered him to the ground at gunpoint, handcuffed him, performed a pat-down search and discovered the handgun in N.H.'s left pant leg. N.H. argues his initial encounter with the police was not, as the motion judge found, a field inquiry but an investigatory stop that was unsupported by the required reasonable and articulable suspicion that he was engaged in criminal activity at the time, and that the subsequent stop and pat-down search was the fruit of the initial unlawful seizure. Unpersuaded, we affirm.

The motion judge, following an evidentiary hearing at which Officer Tashawn Bryant and Detective Jermin Spencer testified, found that a telephone caller to the East Orange Police Department reported a shooting in the vicinity of a high school. Bryant was dispatched to the area to locate victims, witnesses or suspects. While en route to the area, Bryant heard a dispatch from a lieutenant posted to the Real Time Crime Prevention Center (CPC). An audio recording, played during Bryant's cross-examination at the suppression hearing, contained the verbatim dispatch: "All will be advised with [sic] two males stepping off from that area. They were going eastbound of Springdale from Prospect. One had on orange pants."

Bryant saw two individuals who matched the description given in the lieutenant's dispatch and transmitted: "All right I have the two males one with

the orange pants walking eastbound [on] Springdale"; she requested backup units and gave a description of the clothing worn by both males. Before Bryant stopped her police vehicle, a plain-clothes detective in an unmarked vehicle drove "into a driveway in front of the two individuals blocking their passageway," and another uniformed officer in a marked vehicle exited his vehicle. The judge further found the detective exited his vehicle and "flashed a badge to . . . identify himself," whereupon one of the males, later identified as N.H., ran. During the evidentiary hearing, N.H.'s counsel told the motion judge that he wanted Bryant to "admit factually what is occurring on the [video]tape, which is that [Bryant's] car is still moving and the detective is out in [sic] and the officer, another marked unit is parked alongside." The judge told counsel he had "established that"; and that Bryant stopped the car before she got out, meaning she was still in a moving vehicle when N.H. began to run.

After Bryant exited her vehicle, she saw an object in N.H.'s right hand as he ran. Although she believed the object was a handgun, she radioed only for pursuing officers to use caution. She also transmitted the color of N.H.'s clothing and his direction of travel.

Spencer heard Bryant's transmissions, saw a male wearing orange pants running in the area described by Bryant, drew his gun and ordered the male,

N.H., to the ground. N.H. complied, was handcuffed and frisked; Spencer seized the gun.

We defer to the trial court's factual findings on a motion to suppress, "unless they were 'clearly mistaken' or 'so wide of the mark' that the interests of justice require[] appellate intervention." State v. Elders, 192 N.J. 224, 245 (2007) (quoting N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007)). In State v. S.S., our Supreme Court extended that deferential standard of review to "factual findings based on a video recording or documentary evidence" to ensure that New Jersey's trial courts remain "'the finder of the facts[.]'" 229 N.J. 360, 381 (2017) (quoting Fed. R. Civ. P. 52(a) advisory committee's note to 1985 amendment). The Court explained that "[p]ermitting appellate courts to substitute their factual findings for equally plausible trial court findings is likely to 'undermine the legitimacy of the [trial] courts in the eyes of litigants, multiply appeals by encouraging appellate retrial of some factual issues, and needlessly reallocate judicial authority.'" Id. at 380-81 (second alteration in original) (quoting Fed. R. Civ. P. 52(a) advisory committee's note to 1985 amendment). The trial court's application of its factual findings to the law, however, is subject to plenary review. State v. Cryan, 320 N.J. Super. 325, 328 (App. Div. 1999). We, therefore, review de novo the

motion judge's conclusions that the first encounter the plain-clothes detective had with N.H. was a field inquiry and that the pat-down search followed a justifiable investigatory stop.

An officer is not prohibited from approaching a person and engaging in a voluntary conversation—a field inquiry. State v. Davis, 104 N.J. 490, 497 (1986); State v. Stampone, 341 N.J. Super. 247, 252 (App. Div. 2001). A field inquiry does not violate Fourth Amendment[1] protections "so long as the officer does not deny the individual the right to move." State v. Sheffield, 62 N.J. 441, 447 (1973); see also State v. Rosario, 229 N.J. 263, 273-74 (2017) (citing State v. Egan, 325 N.J. Super. 402, 410-11 (App. Div. 1999)). "A field inquiry is permissible so long as the questions '[are] not harassing, overbearing, or accusatory in nature.'" State v. Pineiro, 181 N.J. 13, 20 (2004) (alteration in original) (quoting State v. Nishina, 175 N.J. 502, 510 (2003)). "The officer's demeanor is relevant to the analysis." State v. Rodriguez, 172 N.J. 117, 126 (2002) (citing Davis, 104 N.J. at 497 n.6). "For example, 'an officer would not be deemed to have seized another if his questions were put in a conversational manner, if he did not make demands or issue orders, and if his questions were

_____

[1] U.S. Const. amend. IV; see also State v. Handy, 206 N.J. 39, 45-46 (2011) (recognizing that, like the Fourth Amendment, the "parallel language" of N.J. Const. art. I, ¶ 7 protects citizens from unreasonable searches and seizures).

A-4896-17T2

not overbearing or harassing in nature.'" Ibid. (citation omitted) (quoting Davis, 104 N.J. at 497 n.6).

"An encounter becomes more than a mere field inquiry when an objectively reasonable person feels that his or her right to move has been restricted." Ibid. The critical inquiry when determining whether a field inquiry was converted into an investigative detention is whether a reasonable citizen under the same circumstances would have felt that the officer restrained his or her right to move by physical force or a show of authority. State v. Tucker, 136 N.J. 158, 164-66 (1994) (citing U. S. v. Mendenhall, 446 U.S. 544, 553-54 (1980)).

Although the motion judge mentioned that the detective, when he pulled his unmarked vehicle "into a driveway in front of the two individuals[,] block[ed] their passageway," the judge concluded that the officer, by so operating the vehicle, flashing his badge and identifying himself "was [making] an appropriate field inquiry." We agree.

The judge found the detective "did not have the opportunity to even approach [N.H.] and the other gentleman . . . [t]o ask if they were willing to answer some questions." The detective's display of his badge—especially considering he was not in uniform and his vehicle was not marked—was not the

6

"physical force or . . . show of authority" sufficient to restrain N.H.'s freedom of movement. Mendenhall, 446 U.S. at 553. It was simply a prudent way to show the pair he was a police officer and not someone alighting from a car to accost them.

We are unconvinced by N.H.'s attempt to analogize the facts of this case to those in Rosario. There a police officer who received an anonymous tip that the defendant was selling drugs recognized defendant's car while on patrol. Rosario, 229 N.J. at 267. The officer positioned his car at a perpendicular angle approximately seven to ten feet in front of the defendant's car, partially confining the defendant's vehicle to an enclosed area. Id. at 268. He then activated the rooftop flood light on his patrol car, aimed it at the defendant's car, and, after noticing that she was still in the car, approached her and asked her to produce identification. Ibid. Under those circumstances, the Court concluded the encounter was an investigative detention because someone

> sitting in a lawfully parked car outside her home who
> suddenly finds herself blocked in by a patrol car that
> shines a flood light into the vehicle, only to have the
> officer exit his marked car and approach the driver's
> side of the vehicle, would not reasonably feel free to
> leave.
>
> [Id. at 273.]

A-4896-17T2

The Court also commented that the officer's request for identification, "[a]lthough not determinative . . . reinforce[d] that this was an investigative detention." Ibid.

Here, N.H. ran before the detective uttered a word. There was no question posed, nor command given. And, obviously, N.H. was not prevented from leaving. In short, N.H. fled before the field inquiry could begin. The detective's mere act of pulling his vehicle in front of N.H. into a driveway is not a show of authority that, without more, would cause someone to believe he was not free to leave. This street encounter was the type of legitimate police practice that courts have not restricted. The Mendenhall Court recognized the United States Supreme Court's prior acknowledgment of the "need for police questioning as a tool in the effective enforcement of the criminal laws." 446 U.S. at 554. "Without such investigation, those who were innocent might be falsely accused, those who were guilty might wholly escape prosecution, and many crimes would go unsolved. In short, the security of all would be diminished." Ibid. (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973)).

The police pursuit and subsequent seizure of N.H. was justified as an investigatory stop, familiarly known as a Terry stop. Terry v. Ohio, 392 U.S. 1 (1968). Our analysis of the propriety of an investigatory stop balances the

competing interests between "a citizen's privacy and freedom of movement" and "proper law[]enforcement activities." Davis, 104 N.J. at 504-05. Investigative stops are justified, even absent probable cause, "if the evidence, when interpreted in an objectively reasonable manner, shows that the encounter was preceded by activity that would lead a reasonable police officer to have an articulable suspicion that criminal activity had occurred or would shortly occur." Id. at 505. Courts are to determine whether the totality of the circumstances gives rise to an "articulable [and] particularized" suspicion of criminal activity, not by use of a strict formula, but "through a sensitive appraisal of the circumstances in each case." Ibid.

Our Supreme Court recognized the two-step analysis set forth in United States v. Cortez, 449 U.S. 411, 418 (1981),

> for determining whether the totality of circumstances creates a "particularized suspicion." A court must first consider the officer's objective observations. The evidence collected by the officer is "seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." "[A] trained police officer draws inferences and makes deductions . . . that might well elude an untrained person. The process does not deal with hard certainties, but with probabilities." Second, a court must determine whether the evidence "raise[s] a suspicion that the particular individual being stopped is engaged in wrongdoing."

[Davis, 104 N.J. at 501 (alterations in original) (citations omitted) (quoting Cortez, 449 U.S. at 418.)]

N.H. argues that, like the defendant in Tucker, his flight did not justify a Terry stop. See Tucker, 136 N.J. at 169-70. Unlike the defendant in Tucker, who was observed by police simply sitting on a curb before he fled, was chased and stopped, id. at 161-62, police pursued N.H. only after Bryant saw the object in his hand as he ran. The Tucker Court noted our observation that what the record in that case "does not show is also highly persuasive:  no observed criminal activity; no particularized suspicious conduct . . .; no reports of recent nearby crimes; [and] no descriptions of recent crime suspects[.]"  Id. at 169 (quoting State v. Tucker, 265 N.J. Super. 358, 360 (App. Div. 1993), aff'd, 136 N.J. 158 (1994)).  The record here, however, as the motion judge found, does contain sufficient facts to justify the investigatory stop that resulted in the seizure of the gun from N.H.

From Bryant's credited testimony, and his review of the body-cam and dash-cam recordings, the motion judge found that as soon as N.H. began to run, Bryant broadcast that she saw an object in N.H.'s hand. That fact, together with the observation of N.H. and his companion leaving the area of the reported shooting, led the motion judge to conclude police had a reasonable and articulable suspicion that justified a Terry stop. The judge also determined that

Spencer—with full knowledge of Bryant's broadcast about the object in N.H.'s hand, N.H.'s orange clothing and his direction of travel—was justified in stopping the male wearing orange pants and patting him down for weapons.

Inasmuch as both the attempted initial inquiry by the detective and Spencer's investigatory stop and frisk fell within the delineated exceptions to the warrant requirement, State v. Maryland, 167 N.J. 471, 482 (2001); State v. Piniero, 181 N.J. 13, 20-21 (2004), the seizure of the gun was constitutionally permissible, and the motion to suppress was properly denied.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

11