**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2755-22

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

MARC W. DENNIS,

    Defendant-Appellant.

---

Argued February 26, 2025 - Decided March 26, 2025

Before Judges Mayer, DeAlmeida and Puglisi.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 18-12-0202.

Stephen W. Kirsch, Designated Counsel, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Stephen W. Kirsch, on the brief).

Thomas R. Clark, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Thomas R. Clark, of counsel and on the brief).

PER CURIAM

Defendant Marc W. Dennis appeals from a March 28, 2023 judgment of conviction after a jury trial. We affirm.

Defendant was a New Jersey State Trooper (Trooper) assigned to the Alcohol and Drug Testing Unit with the New Jersey State Police. Among his duties, defendant was entrusted to calibrate close to six hundred "Alcotest 7110 MKIII-C" (Alcotest) machines used by law enforcement throughout the State. The Alcotest is a breath testing device used to determine an individual's blood alcohol content.[1]

One step of calibrating an Alcotest machine required defendant to use a specific battery-operated thermometer. On October 2, 2015, a fellow Trooper discovered the battery in defendant's thermometer was dead. Without a functioning thermometer, defendant could not have calibrated any Alcotest units for accuracy. Upon discovering the inoperable thermometer, the fellow Trooper wrote his initials, badge number, and date on the thermometer's battery. He then reinserted the battery "backwards" into the thermometer without "connecting it

---

[1] The failure to properly calibrate Alcotest units was addressed by the New Jersey Supreme Court in State v. Cassidy, 235 N.J. 482 (2023). The Court held results from improperly calibrated breath-alcohol testing devices were insufficiently reliable to be admissible in driving while intoxicated cases. Id. at 498.

A-2755-22

to the terminal." Defendant subsequently submitted paperwork indicating he performed three calibrations on October 6 and 7, 2015.

The fellow Trooper testified he reinspected defendant's Alcotest unit on October 8 and found the battery "in the same exact way" he "left it." When the fellow Trooper showed defendant the non-functional thermometer, defendant maintained he performed the calibrations. Defendant specifically denied the battery in the thermometer was the same one he used for the calibrations on October 6 and 7.

In December 2015, defendant, the fellow Trooper, and their supervisors met to discuss the matter. At the meeting, defendant failed to explain his "side of the story." A supervisor told defendant he was "not a good fit" for the Alcohol and Drug Testing unit. Defendant left the meeting, saw a doctor affiliated with the New Jersey State Police, and received approved "stress leave" from his job as a Trooper.

In early January 2016, defendant reported he lost his wallet with his official State Police identification card (ID). There are discrepancies in the record regarding the date defendant lost his wallet. Defendant claimed he lost the wallet on New Year's Eve when he left a physical therapy office. However,

3

in his official report of the lost ID, defendant indicated the loss occurred on January 4. Defendant received a replacement ID card that month.

On September 19, 2016, the New Jersey State Police suspended defendant due to his failure to calibrate the Alcotest units. Defendant was instructed to "turn in all Division badges, identification cards, [and] other Division owned property and equipment" and was "relieved of all law enforcement powers and Division privileges." Defendant handed in his replacement ID, a billfold ID, and his badge.

In 2017 and 2018, while he remained suspended, four police officers from different municipalities stopped defendant's car for various motor vehicle violations.[2] On all four occasions, the officers allowed defendant to proceed without issuing a ticket. The jury saw body-worn camera (BWC) or dash-cam footage from each traffic stop. Two of the videos showed defendant display a document to each officer, prompting those officers to allow defendant to drive away without a ticket. The four officers who stopped defendant's car testified defendant presented a New Jersey State Police ID or some form of law enforcement ID. However, defendant told the jury he presented a personal

---

[2] The traffic stops occurred in Berkeley, Lakehurst, Marlboro, and Toms River.

business card, not his State issued ID, because he turned in his ID when he was suspended.

The traffic stop in Toms River occurred on March 27, 2018. The BWC video from this stop showed the police officer activate the flashing lights on his patrol car, exit the car, walk to defendant's car, argue with defendant, and allow defendant to continue driving without issuing a ticket. The Toms River police officer testified defendant displayed a "New Jersey State Police" ID with "a golden triangle on it."

The Toms River police officer further testified he recognized defendant's name and "knew there was an issue with him."[3] Following the motor vehicle stop of defendant's car and knowing defendant was suspended from his job as a Trooper, the Toms River police officer "inquired to see if . . . [defendant] was allowed to carry a State Police ID." The officer told the jury that police officers suspended from their position with the Toms River Police Department were "not allowed to identify themselves as a police officer."

---

[3] Based on widespread news reporting at the time, the Toms River police officer presumably knew defendant was suspended from his job with the New Jersey State Police as a result of defendant's alleged failure to properly calibrate the Alcotest machines.

In 2018, Eric Barlow was "the Bureau Chief in charge of the Internal Affairs Investigation Bureau" for the New Jersey State Police. According to Barlow, he received "a complaint" from the Toms River police officer that defendant was "presenting a[n] ID after being stopped multiple times for motor vehicle violations." Based on that complaint, Barlow commenced an investigation. As part of his investigation, Barlow sent an email to defendant's attorney expressing a belief that defendant had located and retained the State Police ID reported as lost. Barlow specifically asked defendant's attorney "to inquire" if defendant "would produce the credit card State Police ID."

Defendant denied showing a State Police ID to any of the four police officers who stopped his car. Rather, defendant testified he displayed his personal business card to those officers. He further explained he was not required to turn in his personal business cards when he was suspended from his job with the New Jersey State Police.

According to defendant, his business card indicated he was a member of the New Jersey State Police and included his name, rank, telephone number, email address, and assigned unit. Defendant further testified his business card had "a [S]tate [P]olice logo" and looked "similar" to the State Police ID. Defendant claimed he kept the business card "right in front of [his] license," and

it was his business card the four police officers saw during the motor vehicle stops. He also denied having a State Police ID after his suspension and testified he never found his lost State Police ID.

On December 20, 2018, the Monmouth County Grand Jury returned Superseding Indictment No. 18-12-0202, charging defendant with: second-degree official misconduct related to "falsely representing that he had performed the calibration checks" on the Alcotest units "consistent with the mandated procedure," N.J.S.A. 2C:30-2 (count one); second-degree official misconduct related to exercising "unlawful control over . . . a New Jersey State Police issued wallet identification" card, N.J.S.A. 2C:30-2 (count two); second-degree pattern of official misconduct, N.J.S.A. 2C:30-7 (count three); third-degree tampering with public records or information, N.J.S.A. 2C:28-7a.(1) and (2) (count four); third-degree theft by unlawful taking, N.J.S.A. 2C:20-3 and 2C:20-2b.(2)(g) (count five); and fourth-degree falsifying records, N.J.S.A. 2C:21-4a. (count six). Counts one, four, and six related to defendant's alleged failure to calibrate the Alcotest units. Counts two and five related to defendant's alleged use of a State Police ID after his suspension. Count three related to either or both of counts one and two.

A-2755-22

The jury heard testimony between April 19 and 28, 2022. After hearing the testimony and the judge's instructions, the jury acquitted defendant on counts one, four, and six and convicted him on counts two, three, and five.

On March 15, 2023, the judge sentenced defendant as follows: on count two, a prison term of five years, with a five-year period of parole ineligibility; on count three, a prison term of five years, with a five-year period of parole ineligibility to be served concurrently to count two. The judge merged defendant's conviction on count five with his conviction on count two. In addition, the judge ordered defendant's forfeiture of his pension and future public employment.

On appeal, defendant raises the following arguments.

POINT I

> IT WAS REVERSIBLE ERROR FOR THE TRIAL JUDGE TO SEND THE JURY BACK FOR MORE DELIBERATION -- AFTER THE JURY'S SECOND ANNOUNCEMENT THAT IT HAD A PARTIAL VERDICT ON SOME COUNTS, BUT WAS DEADLOCKED ON OTHERS -- AT 4:45 PM, WHEN THE JUDGE ALREADY HAD KNOWN FOR OVER A WEEK THAT MORE THAN ONE OF 13 JURORS WERE ON VACATION AS OF THE NEXT MORNING. THAT ERROR WAS EXACERBATED BY BOTH: (1) THE JUDGE'S FAILURE TO FOLLOW THE MODEL SUPPLEMENTAL INSTRUCTION WHICH INQUIRES OF THE JURY WHETHER FURTHER DELIBERATION MIGHT BE

8

BENEFICIAL OR FUTILE, AND (2) THE JUDGE'S STATEMENT TO THE JURY AT 4:45 PM THAT SHE WOULD "DETERMINE HOW LONG WE CAN HAVE YOU HERE TODAY."

POINT II

THE JURY NEVER RETURNED A VERDICT FOR ALL OF THE ELEMENTS OF OFFICIAL MISCONDUCT; THEREFORE, THE VERDICTS FOR OFFICIAL MISCONDUCT AND A PATTERN OF OFFICIAL MISCONDUCT MUST BE REVERSED. (NOT RAISED BELOW)

POINT III

THE PARAMETERS OF THE LEGAL DUTIES OF A PUBLIC SERVANT ARE A LEGAL MATTER THAT SHOULD BE INSTRUCTED TO THE JURY BY THE JUDGE. NOT ONLY WERE THEY NOT INSTRUCTED HERE -- REVERSIBLE ERROR UNTO ITSELF -- BUT THEY WERE INSTEAD ONLY THE SUBJECT OF TESTIMONY FROM MULTIPLE FACT WITNESSES, THEREBY ALLOWING THE JURY TO PICK AND CHOOSE WHAT OF THAT FACTUAL TESTIMONY IT DECIDED TO CREDIT. (PARTIALLY RAISED BELOW)

POINT IV

THE MANNER IN WHICH OFFICIAL MISCONDUCT AND A PATTERN OF OFFICIAL MISCONDUCT WERE PRESENTED TO THE JURY IMPROPERLY ALLOWED THE JURY TO BE NON-UNANIMOUS REGARDING THE THEORY OF GUILT. AS REQUESTED BY DEFENSE COUNSEL, THE VERDICT SHOULD HAVE BEEN TAKEN IN A

9

MANNER THAT DEMANDED INDIVIDUAL UNANIMOUS FINDINGS ON THE UNDERLYING ALLEGATIONS OF THOSE COUNTS.

POINT V

THE PROSECUTOR'S DECISION TO CROSS-EXAMINE DEFENDANT -- AND THEN ARGUE TO THE JURY IN SUMMATION -- ABOUT THE ISSUE OF WHETHER DEFENDANT'S PERSONAL BUSINESS CARD FAILED TO COMPLY WITH INTERNAL REGULATIONS OF THE STATE POLICE WAS A BRAZEN ATTEMPT TO INFLUENCE THE VERDICT WITH INADMISSIBLE "PRIOR BAD ACTS" EVIDENCE THAT HAD NO ACTUAL RELEVANCE TO THE CASE; ALTERNATIVELY, NO JURY INSTRUCTION WAS DELIVERED REGARDING THAT EVIDENCE. (NOT RAISED BELOW)

POINT VI

THE STATE IMPROPERLY ELICITED A LAY OPINION FROM THE BUREAU CHIEF IN CHARGE OF INTERNAL INVESTIGATIONS IN THE STATE POLICE THAT DEFENDANT HAD DONE EXACTLY WHAT THE STATE WAS ACCUSING DEFENDANT OF DOING: THAT HE IMPROPERLY RETAINED HIS OFFICIAL STATE-POLICE WALLET IDENTIFICATION CARD AFTER FALSELY REPORTING IT TO BE STOLEN. (NOT RAISED BELOW)

POINT VII

THE DEFENSE WAS IMPROPERLY BARRED FROM INTRODUCING EVIDENCE OF DEFENDANT'S CONDUCT AT OTHER

10

CONTEMPORANEOUS TRAFFIC STOPS -- SPECIFICALLY THAT, AT THOSE STOPS, DEFENDANT OFFERED HIS BUSINESS CARD, AND DID NOT DISPLAY HIS STATE-POLICE WALLET IDENTIFICATION CARD. THAT EVIDENCE WAS ADMISSIBLE EVIDENCE OF HABIT UNDER N.J.R.E. 406.

POINT VIII

THE JUDGE FAILED TO ASSIGN A BURDEN OF PROOF BEYOND A REASONABLE DOUBT TO THE JURY'S ANSWERING OF THE "YES/NO" INTERROGATORIES ON THE VERDICT SHEET; MOREOVER, THE USE OF SUCH INTERROGATORIES, PARTICULARLY FOR THE STANDARD ELEMENTS OF A CRIME, ARE IMPROPER UNDER STATE V. SIMON.[4] (NOT RAISED BELOW)

POINT IX

IF OTHERWISE UPHELD, THE THEFT CONVICTION SHOULD BE MODIFIED TO A DISORDERLY-PERSONS OFFENSE; COMMON SENSE DICTATES THAT THE LEGISLATURE DID NOT INTEND A STATE-EMPLOYEE IDENTIFICATION CARD TO CONSTITUTE A "PUBLIC RECORD, WRITING, OR INSTRUMENT" THAT, WHEN MERELY RETAINED INAPPROPRIATELY, CAUSES THE EMPLOYEE TO BE GUILTY OF COMMITTING A THIRD-DEGREE CRIME, PUNISHABLE BY UP TO FIVE YEARS IN PRISON, RATHER THAN A MERE DISORDERLY-PERSONS OFFENSE.

---

4  79 N.J. 191 (1979).

A-2755-22

I.

We first consider defendant's argument the judge erred in allowing the jury to continue deliberating rather than accepting a partial verdict. During deliberations, the jury sent two notes to the judge indicating a deadlock among the jurors. After the first note, the judge delivered the charge under State v. Czachor, 82 N.J. 392, 406 (1980), instructing the jury to continue deliberating. The jury then sent a second note indicating it reached a decision on certain counts but remained deadlocked on the other counts. The judge again issued a Czachor charge and instructed the jury to continue deliberating. Defendant asserts the judge should have accepted the second deadlock as "definite" and entered a partial verdict.

Defendant further argues the judge's instruction to continue deliberations after the second deadlock note "was simply too coercive to pass constitutional muster." Defendant contends the judge should have inquired if the jury believed further deliberations would be futile. He also claims the judge erred when she "told the jury that she was looking into how late she could keep them" that evening because the judge knew at least two jurors had planned vacations the next day. Defendant argues the judge violated his "Sixth Amendment right to a

jury trial, his Fourteenth Amendment right to due process and his corresponding state-constitutional rights" and seeks reversal of his conviction and a new trial.

During the trial, someone tested positive for COVID-19. As a result, the judge delayed the trial for one week, which impacted the anticipated completion date for the trial. On May 2, the judge learned several jurors had vacation plans starting on May 11. The trial resumed on May 9, 2022, with defense counsel and the State giving closing arguments and the judge charging the jury. The jurors were instructed to return at 9:00 a.m. on May 10 to begin deliberating.

On May 10, before the jurors entered the courtroom, defense counsel reminded the judge about the jurors' vacation plans. Defendant's attorney requested the judge tell the jury "there's no rush" to arrive at a verdict because, if deliberations did not conclude that day, "we're going to continue with . . . whatever number [of jurors] we have left." Since the judge found there was "no indication as of now that they're rushed," she declined "to put in their minds that for some reason they should be taking longer than they need."

The jury began deliberating at 9:28 a.m. on May 10. The jury recessed for lunch at 12:29 p.m. and resumed deliberating at 1:42 p.m.

At 2:22 p.m., the jury sent a note to the judge which read: "[W]e're in a deadlock and not sure what to do. Can you advise?" Four minutes later, the

judge issued the <u>Czachor</u> charge, instructing the jury to continue deliberating without surrendering any "honest conviction as to the weight or effect of the evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict." After the jurors returned to the jury room, defense counsel again expressed a concern that the upcoming juror vacations would cause the jury to rush deliberations.

The judge rejected the defense counsel's concerns, finding:

> These jurors have been sworn, they have been diligent throughout this process. There's no indication in any of their notes that they're at all concerned with the time. They certainly have plenty of time still left in the day for their deliberations.
>
> It's not unusual necessarily for there to be a request for advice when there is a deadlock and that's why there is a model [jury] instruction for them to continue deliberations.
>
> At this juncture[,] I think to speculate as to anything else is premature and, again, we will see what happens, we'll see if there's another note accordingly assuming there is one. But I'm not going to interject and I felt at this point, with that kind of information, that I certainly feel could potentially influence the ongoing deliberations that are still in the middle of the afternoon.

At 3:56 p.m., defense counsel told the judge that defendant no longer agreed to stipulate to a jury of less than twelve. Additionally, defendant's

14

attorney repeated his concern the jury would "rush to get a verdict."  The judge

declined "to speculate . . . whether the jurors are rushing or not" and would not

guess as to the jurors' "personal affairs."  The judge further explained:

> [The jurors] have been diligent, they have been dedicated, and they have given no indication that there's any concern, again, with them being able to deliberate or not deliberate.  . . . They certainly could have changed their plans, they certainly could decide to do something different.  Again, as far as I know, they're deliberating, they're deliberating consciously, . . .  I have no indicat[ion] otherwise.

At 4:05 p.m., the judge told the attorneys she would have the jurors return

to the courtroom around 4:30 p.m. and "ask them to confer as to whether they

want to continue deliberations or whether they would like to come back

tomorrow, and then we will see where we are at that juncture."  Because there

was no stipulation to proceed with less than twelve jurors, which would have

prompted the judge to voir dire the jurors about continuing to deliberate, she

told the attorneys "we will continue as we would normally do with any other

case and, again, I will give them the same instructions that I normally do . . . at

4:30."

At 4:28 p.m., the judge received a second note from the jury.  The note

read: "[W]e are still deadlocked and two of the jurors are leaving town on

vacation tomorrow. What should we do? We made a decision on some of the counts, but not on all."

The judge then discussed the note with both counsel. She explained "we have some leeway to allow them to stay a little bit longer." The judge said she would tell the jury:

> [W]e understand that they appear to have a partial verdict, but that I am going to have them go back into the jury room. Again, I will remind them of their duty to continue deliberating. I'm going to give them a little while longer and . . . see what happens.
>
> Again, I'll tell them that there is no rush, and if they come back again to indicate they haven't made any more progress, then certainly at that point . . . there is the ability to take a partial verdict and I can give them the instructions on that partial verdict . . . . And then I would give them an opportunity to return to the jury room to discuss their decision and then they would let me know what their decision is.

The judge further indicated it was "a little bit past 4:30" and she wanted to give the jury until 5:00 or 5:15 to find "out how late they can stay, should they wish to stay later to continue deliberations." The judge explained the jury instructions and governing case law "provide for a reasonable period of time for deliberations and that what is reasonable has to be placed within the context of the case, the complexity of the case, the length of the case, [and] the evidence presented." Given the trial lasted three weeks, the judge concluded the jury had

16

not been deliberating for "an overly . . . unreasonable period of time, and . . . further deliberations would certainly be reasonable." Further, the judge stated: "In no way have the jurors been rushed. In no way have they indicated that they're rushed." The judge explained she would further advise the jurors "there is no rush and that . . . we can consider other options if necessary. So they're aware that the [c]ourt is aware of their situation."

At 4:43 p.m., the jury returned to the courtroom, and the judge repeated the Czachor charge. The judge told the jury:

> I will determine how long we can have you here today, and certainly if you reach a point where you feel that you need to notify the [c]ourt again, you can certainly do as you have done now. We have—in terms of what to do, since that is part of the question, what should we do, there are options, but again we will take things one step at a time—all right?—and we will address those as we—as we go. All right?
>
> So, again, I want to thank you for your diligence and I am giving you those instructions. That is what we're going to do now, is I'm going to encourage you to continue your deliberations for a little while longer. All right? Thank you.

After the jury left the courtroom to continue deliberating, defense counsel did not request a supplemental Model Jury Charge asking the jury if it believed further deliberations would be futile. However, defendant's attorney objected

17

"to them being pushed to try and make a decision" after the jury twice indicated a deadlock.

At 5:08 p.m., the judge received a note from the jury. The note read, "[W]e, the jury, have a unanimous decision on all." Upon returning to the courtroom, the jury foreperson announced not guilty verdicts on counts one, four, and six and guilty verdicts on counts two, three, and five. The judge polled the jurors and each stated their unanimous agreement with the verdicts announced by the jury foreperson.

We review a trial court's decision to issue a Czachor charge for abuse of discretion. See State v. Ross, 218 N.J. 130, 144 (2014). "A court abuses its discretion when its 'decision is made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" State v. Chavies, 247 N.J. 245, 257 (2021) (quoting State v. R.Y., 242 N.J. 48, 65 (2020)).

"[A] jury verdict must not be the product of coercion." Ross, 218 N.J. at 144. In Czachor, our Supreme Court held that when juries express an impasse, "a charge containing coercive features should not be given to a jury in the trial of a criminal case." 82 N.J. at 402. The Model Jury Charge addressing jury

deadlock incorporates the concerns expressed in <u>Czachor</u>. The Model Jury

Charge reads:

> It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous but do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict. You are not partisans. You are judges—judges of the facts.
>
> [<u>Model Jury Charges (Criminal)</u>, "Judge's Instructions on Further Jury Deliberations" (approved Jan. 14, 2013).]

When "a jury has announced its inability to agree," a judge may "require

further deliberations" but "may not coerce or unduly influence the jury in

reaching a verdict." <u>State v. Harris</u>, 457 N.J. Super. 34, 50 (App. Div. 2018)

(first quoting <u>State v. Johnson</u>, 436 N.J. Super. 406, 422 (App. Div. 2014); and

then quoting <u>State v. Carswell</u>, 303 N.J. Super. 462, 478 (App. Div. 1997)). The

"Court has disapproved even subtle intrusions into the neutral area of jury

deliberations." <u>Czachor</u>, 82 N.J. at 400. Judges must avoid a "results-oriented

message that could be perceived as intolerant of dissent and antagonistic to the

19

free expression of strongly held beliefs." State v. Gleaton, 446 N.J. Super. 478, 515 (App. Div. 2016) (quoting State v. Dorsainvil, 435 N.J. Super. 449, 481 (App. Div. 2014)). Such pressure would be "inconsistent with jury freedom and responsibility" by discouraging jurors from deliberating "objectively, freely, and with an untrammeled mind." Czachor, 82 N.J. at 402.

A judge may give a Czachor charge more than once. State v. Figueroa, 190 N.J. 219, 235 (2007). There is no "per se rule that would limit the number of times when the . . . instruction could be given to a deadlocked jury." Id. at 234. A trial judge has discretion to require further deliberations after the jury announces an inability to reach a verdict provided "the jury has [not] reported a definite deadlock after a reasonable period of deliberations." Czachor, 82 N.J. at 407. A "jury is deadlocked" when the "difference of opinion between members of the jury is clearly intractable." Ross, 218 N.J. at 145 (quoting Figueora, 190 N.J. at 237). A trial judge seeking to repeat the Czachor charge must consider "the length and complexity of [the] trial and the quality and duration of the jury's deliberations." Id. at 144 (quoting Czachor, 82 N.J. at 407).

Here, the jury twice indicated it reached a "deadlock." However, the jury did not convey an intractable inability to continue deliberations. Nor did the

jury indicate further discussions would be unproductive.  Rather, the jury asked for the judge's advice and the judge provided the requested advice by giving the Czachor charge.

Additionally, the trial in this case lasted three weeks.  The jury deliberated for about four hours when it sent the first note seeking the judge's advice.  The jury then sent the second note about two hours after the first note.  Under the circumstances, given the length and complexity of the trial, it was too soon for the judge to believe the jury was intractably deadlocked.

Further, "it is not always necessary for the trial court" to inquire of the jury whether further deliberations would likely result in a verdict, particularly when "the jury had only been deliberating briefly."  Figueroa, 190 N.J. at 240.  From the time the jury began deliberating at 9:28 a.m., through the time of the second note at 4:28 p.m.,[5] the judge noted the jury deliberated conscientiously and diligently.

Moreover, "a previously deadlocked jury can conduct fair and effective deliberations notwithstanding an earlier impasse."  Ross, 218 N.J. at 154.  As Czachor held, "a properly instructed jury can and will meaningfully deliberate,

_____

[5]  The jury recessed for lunch from 12:29 p.m. to 1:42 p.m.

notwithstanding a prior declaration of an impasse." Id. at 154 n.5. That is precisely the path followed by the judge in this matter.

On these facts, we are satisfied the judge did not abuse her discretion by repeating the Czachor charge and instructing the jury to deliberate further without inquiring about the jury's ability to reach a verdict.

II.

We next consider defendant's argument that his conviction for official misconduct must be reversed because the jury did not return a verdict on all of the elements of the offense. The judge divided the jury interrogatory under count two, official misconduct, into two questions on the verdict sheet. Defendant describes the first question as encompassing the "non-benefit elements of official misconduct." Defendant describes the second question as encompassing "the benefit element" of official misconduct.

Because the jury failed to indicate its response to Question 1(b), defendant argues he "was denied his right to a valid jury verdict under the Sixth Amendment, to due process and a fair trial under the Fourteenth Amendment, and to all of those right[s] as set forth in the state constitution." We disagree.

The State argues the failure to answer Question 1(b) on the verdict sheet did not impact the verdict because defendant "never argued to the jury that

22

[c]ount [t]wo involved a pecuniary benefit." Further, the State asserts the judge properly instructed the jury on the elements of official misconduct, the jury reported a unanimous verdict, and the jury poll reflected that result.

The verdict sheet addressed the official misconduct charge under count two as follows:

> [Question] 1(a). How do you find with respect to Count Two, <u>Official Misconduct</u>, that between on or about September 19, 2016 and on or about August 23, 2018, the defendant, Marc W. Dennis did commit <u>Official Misconduct</u> by knowingly unlawfully taking or exercising control over the New Jersey State Police Wallet Identification and/or by displaying said State Police issued Wallet Identification did improperly represent himself to be an active-duty member of the New Jersey State Police?
>
> Not Guilty ____     Guilty ____
>
> [Question 1]b. If guilty, answer the following question: Did the defendant obtain or seek to obtain, for himself or another, a non-pecuniary benefit, or did he seek to injure another or deprive another of a benefit?
>
> Yes ____     No ____

The jury checked "guilty" for Question 1(a). However, the jury did not check an answer for Question 1(b). Neither the judge nor defense counsel made any inquiry regarding the failure to respond to Question 1(b).

Official misconduct constitutes "a crime of the second degree," unless the defendant sought a pecuniary benefit "of a value of $200.00 or less," in which case it constitutes "a crime of the third degree." N.J.S.A. 2C:30-2. Consistent with well-established case law, official misconduct must "start from the premise that the offense is of the second degree" unless the pecuniary "exception" applies. State v. Lake, 408 N.J. Super. 313, 321-22 (App. Div. 2009) (quoting State v. Phelps, 187 N.J. Super. 364, 374-75 (App. Div. 1983)). The exception does "not apply to 'a benefit not subject to pecuniary measurement.'" Id. at 322 (quoting Phelps, 187 N.J. Super. at 375). Where the "benefit is not subject to pecuniary measurement," there is no burden upon the State "to provide evidence as to any pecuniary value with respect to it." Ibid.

At trial, the State argued defendant sought a benefit of avoiding "the consequences of traffic tickets" due to "laziness" or "shortcutting." Because the State claimed defendant's actions constituted "a non-pecuniary benefit," it asserted the allegations in count two reflected a second-degree crime.

The judge found the State did not assert "defendant undertook any of these actions for a pecuniary benefit." Rather, the judge explained the State alleged defendant sought "to obtain privileges, whatever they may be." Based on the official misconduct statute and language in the Model Jury Charge for official

24

misconduct, the judge concluded count two of the indictment reflected second-degree official misconduct. However, the judge allowed defense trial counsel "to propose some authority or some additional language" related to gradation of the official misconduct charge. Defendant did not proffer any such authority.

The jury returned guilty verdicts on counts two, official misconduct, and three, a pattern of official misconduct. When the judge polled the jury after the verdict, each juror concurred with the verdict announced in court. The jury foreperson handed the official verdict sheet to the court officer.

Because defense trial counsel failed to object at trial, we review the issue for plain error. State v. Harvey, 151 N.J. 117, 153 (1997). Plain error is one "clearly capable of producing an unjust result." R. 2:10-2; State v. Galicia, 210 N.J. 364, 386 (2012). "The error must have been of sufficient magnitude to raise a reasonable doubt as to whether it led the jury to a result it would otherwise not have reached." State v. Weston, 222 N.J. 277, 294 (2015) (quoting Pressler & Verniero, Current N.J. Court Rules, cmt. 2.1 on R. 2:10-2 (2025)). Because jury instructions "serve as the jury's primary guide as it considers the charges and the evidence," errors in a verdict sheet are harmless unless the verdict sheet itself was misleading. State v. Cuff, 239 N.J. 321, 341 (2019) (quoting State v. Gandhi, 201 N.J. 161, 196 (2010)). A "finding of plain error depends on an

evaluation of the overall strength of the State's case." State v. Chapland, 187 N.J. 275, 289 (2006).

"A verdict sheet is intended for recordation of the jury's verdict and is not designed to supplement oral jury instructions." Gandhi, 201 N.J. at 196. Where the judge's jury instructions "were sufficient to convey an understanding of the elements [of the offense] to the jury," and "the verdict sheet was not misleading, any error in the verdict sheet can be regarded as harmless." Id. at 197.

"The purposes of submitting interrogatories [on a verdict sheet] are to require the jury to specifically consider the essential issues of the case, to clarify the court's charge to the jury, and to clarify the meaning of the verdict and permit error to be localized." Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 419 (1997) (internal quotation marks omitted). "The use of the verdict sheet is only for the purpose of facilitating the court's determination of the grade of the offense after guilt has been established." Pressler & Verniero, Current N.J. Court Rules, cmt. 2.1 on R. 3:19-1 (2025). A verdict sheet may include interrogatories requiring the jury to find facts relevant to the gradation of the crime after the jury renders a guilty verdict on the substantive elements of the offense. See State v. Riccardi, 284 N.J. Super. 459, 469 (App. Div. 1995).

In this case, the judge charged the jury as to the elements of official misconduct. However, defendant contends the instruction left the jury "without a proper and full legal definition of all of the elements of official misconduct."

In answering Question 1(a), addressing the elements of the crime, the jury found defendant guilty of official misconduct on count two. Question 1(b) related to gradation of the crime of official misconduct. Because the State never alleged defendant used his State Police ID for pecuniary gain, and never mentioned a dollar value at trial associated with defendant's official misconduct, it was unnecessary for the jury to answer Question 1(b).

We are satisfied the jury's failure to answer Question 1(b) was not clearly capable of producing an unjust result because the State never asserted defendant obtained any pecuniary gain by misusing his State Police ID. Rather, the State asserted defendant's benefit was to avoid traffic tickets, which stemmed from a sense of laziness or entitlement.

As defendant's arguments related to count three are an extension of his arguments regarding count two, we are satisfied there was no plain error regarding his conviction for a pattern of official misconduct on count three.

III.

We turn to defendant's argument that the judge failed to instruct the jury on the legal duties of a public servant. He further asserts the judge erroneously allowed the jury to consider the legal duties of a public servant based solely on the testimony of various fact witnesses. We disagree.

Defendant did not object to the judge's jury instruction on the legal duties of a suspended trooper. However, according to defendant's attorney, the judge discussed the issue with trial counsel "many times" and stated she would "charge the jury on the law regarding the duties of a suspended trooper because those duties 'are a matter of law and not a factual question.'"

At trial, the parties agreed a police officer's duties are a matter of law. The judge also acknowledged the "inherent duties of public servants and officials are matters of law that unquestionably the [c]ourt has a duty to charge the jury on." As the judge stated:

> [I]t would [be] appropriate to charge those inherent duties as part of the law as it is recognized that they are a . . . matter of law and not a factual question, and it's for the jury's determination as to whether the acts for which the [S]tate has put on proofs constitute a violation of those inherent duties.

In her jury instruction, the judge explained, at length, the duties of a public servant. Regarding defendant's failure to return his State Police ID and then his

28

display of that ID to four different police officers to avoid receiving a traffic ticket, the judge told the jury the following:

> [Defendant] . . . being a public servant, to wit, a sworn member of the New Jersey State Police, having the rank of sergeant, having thereby the official functions and duties among others to follow and abide by the official rules and regulations of the New Jersey State Police, to turn in all division badges, identification cards, and all other division-owned property and equipment upon suspension from duty, to refrain from making or causing to be made any false or misleading official statement, or intentionally misrepresenting any facts, to refrain from misrepresenting or attempting to misrepresent his official position as a member of the New Jersey State Police, to secure unwarranted privileges for himself or others, to conduct himself with undivided loyalty to his public trust, to perform his duties in a legal and proper manner, to display good faith, honesty[,] and integrity, and to be impervious to corrupting influences, knowingly did unlawfully take or exercise unlawful control over the moveable property of the New Jersey State Police, that is a New Jersey State Police issued wallet identification did improperly represent himself to be an active duty member of the New Jersey State Police when in fact he was suspended with the purpose to secure a benefit to himself or another, or to injure or deprive another of a benefit contrary to the provisions of N.J.S.A. 2C:30-2, and against the peace of this [S]tate, the government, and dignity of same.

The judge further instructed the State had to prove defendant "committed an act relating to his office, or refrained from performing an act required to be performed as part of his office." In defining an unauthorized act, the judge

29

explained, "[a]n act is unauthorized if it is committed in breach of some prescribed duty of the public servant's office." The judge told the jury that public officials "are under an inescapable obligation to serve the public with the highest fidelity" and "be diligent and conscientious." The judge explained public officers have a duty "[a]bove all, to display good faith, honesty[,] and integrity."

"[C]orrect jury instructions are fundamental to a fair trial." State v. Adams, 194 N.J. 186, 207 (2008). Before a jury deliberates, the "court has an absolute duty to instruct the jury on the law governing the facts of the case." State v. Koskovich, 168 N.J. 448, 507 (2001) (quoting State v. Concepcion, 111 N.J. 373, 379 (1988)). A "charge is a road map to guide the jury, and without an appropriate charge a jury can take a wrong turn." Ibid. (quoting State v. Martin, 119 N.J. 2, 15 (1990)). The judge must "explain to the jury in an understandable fashion its function in relation to the legal issues involved," including "a comprehensive explanation" of the legal principles involved in the matter. Ibid. (quoting State v. Green, 86 N.J. 281, 287-88 (1981)).

When a defendant objects to a jury charge for the first time on appeal, we review for plain error. State v. Munafo, 222 N.J. 480, 488 (2015); R. 2:10-2. A defendant must establish "legal impropriety in the charge prejudicially affecting

the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." Chapland, 187 N.J. at 289 (quoting State v. Hock, 54 N.J. 526, 538 (1969)). "The alleged error is viewed in the totality of the entire charge, not in isolation." Ibid.

"Misconduct in office or official misconduct has been defined as 'unlawful behavior in relation to official duties by an officer entrusted with the administration of justice or who is in breach of a duty of public concern in a public office.'" State v. Brady, 452 N.J. Super. 143, 162-63 (App. Div. 2017) (quoting State v. Kueny, 411 N.J. Super. 392, 404 (App. Div. 2010)). "Whether a statutory duty is imposed upon a public officer is a legal issue." Id. at 164 (quoting State v. Deegan, 126 N.J. Super. 475, 482 (App. Div. 1974)). However, "it is a practical impossibility to spell out with specificity every duty of the office and, therefore, courts take judicial notice of the duties which are inherent in the very nature of the office." Deegan, 126 N.J. Super. at 492.

Public officials "stand in a fiduciary relationship to the public." Id. at 491. "They must be impervious to corrupting influences and they must transact their business frankly and openly in the light of public scrutiny so that the public may know and be able to judge them and their work fairly." Driscoll v. Burlington-

Bristol Bridge Co., 8 N.J. 433, 475 (1952). "When public officials do not so conduct themselves and discharge their duties, their actions are inimicable to and inconsistent with the public interest." Ibid.

Having reviewed the judge's jury instructions as a whole, we are satisfied the judge properly informed the jury as to defendant's duties consistent with State v. Grimes, 235 N.J. Super. 75 (App. Div. 1989). We disagree with defendant's assertion that the judge was required to specify the legal duties of a suspended trooper regarding the turning in or displaying of an official State Police ID. Rather than identify specific conduct by defendant that may have violated the rules and regulations governing troopers employed by the New Jersey State Police, the judge took judicial notice of the countless duties inherent in serving as a police officer, including her recitation of the duties identified in Driscoll. Indeed, the judge followed the court's recommendation in Deegan precisely because it was impossible to identify every duty of a trooper.

IV.

We next consider defendant's argument the judge erred in declining to deliver a specific unanimity instruction related to the official misconduct and pattern of official misconduct counts. We reject this argument.

32

At trial, the judge declined to provide a specific unanimity instruction for counts one or two, alleging official misconduct, or count three, alleging a pattern of official misconduct. The judge explained the State did not charge defendant with "individual counts for each of those acts" alleged in the indictment. Thus, she determined the jury's verdict could be unanimous "as long as they f[ound] him guilty of one" of those counts.

Criminal matters require unanimous verdicts. See N.J. Const. art. I, ¶ 9; R. 1:8-9. All twelve jurors must "be in substantial agreement as to just what a defendant did before determining his or her guilt or innocence." State v. Frisby, 174 N.J. 583, 596 (2002) (internal quotation marks omitted). In certain circumstances, courts may deliver a "specific unanimity" instruction, which requires the jury to agree unanimously on the specific facts underlying a guilty verdict. State v. Parker, 124 N.J. 628, 637 (1991). Generally, courts must give the instruction upon request "where there is a danger of a fragmented verdict." Ibid. (quoting United States v. North, 910 F.2d 843, 875 (D.C. Cir. 1990)); see also Gandhi, 201 N.J. at 163 (internal quotation marks omitted) ("The reviewing court should examine two factors: whether the acts alleged are conceptually similar or are contradictory or only marginally related to each other, and whether there is a tangible indication of jury confusion.").

We reject defendant's argument there was an "extreme chance of splitting the jury on the theory of guilt" because it was possible some jurors found him guilty of failing to surrender his ID, and other jurors found him guilty of displaying that ID during a motor vehicle stop. Unlike the facts in Frisby and Parker, the facts in this case were not contradictory or separate and, therefore, did not require a specific unanimity instruction. A juror who found defendant displayed his State Police ID during a motor vehicle stop would necessarily have concluded defendant failed to surrender that ID.

Because a guilty verdict under any theory required a juror to first determine defendant failed to surrender his State Police ID, we are satisfied there was no likelihood of a fragmented verdict and the judge correctly declined to issue a specific unanimity instruction.

V.

We also reject defendant's argument that the judge erred in permitting the prosecutor to cross-examine defendant on his use of personal business cards that were non-compliant with New Jersey State Police internal regulations. Defendant failed to raise this issue at trial. Thus, we review for plain error. R. 2:10-2.

During defendant's direct examination, defense trial counsel moved defendant's personal business card into evidence. According to defendant's testimony, when he was stopped by the four police officers for motor vehicle infractions, he displayed his personal business card which, at all times, was in front of his driver's license.

During cross-examination, the State confronted defendant with a New Jersey State Police promulgated Standard Operating Procedure (SOP) entitled, "Change notice, SOP C10, 'State Police Business Cards,' dated August 24, 2004." The SOP set forth "the proper format . . . for the production of business cards." On cross-examination, defendant agreed his personal business card violated this SOP.

During summation, the State addressed whether defendant displayed his "State Police identification versus this business card" to the four police officers who conducted the traffic stops. The State noted that the State Police ID and defendant's personal business card "look suspiciously alike" and suggested to the jury that defendant's business card was "crafted to look a lot like" the State Police ID. The State suggested defendant was unlikely to have offered his personal business card when he was an officer in good standing because the "format violate[d] State Police's own protocols." Defendant's attorney did not

object during the State's cross-examination of defendant or the State's summation.

We review a trial court's evidentiary rulings for an abuse of discretion. State v. Canfield, 470 N.J. Super. 234, 336 (App. Div. 2022) (citing State v. Scharf, 225 N.J. 547, 572 (2016)). We "will reverse an evidentiary ruling only if it 'was so wide of the mark that a manifest denial of justice resulted.'" Ibid. (quoting State v. Mauti, 448 N.J. Super. 275, 307 (App. Div. 2017)).

Defendant argues admission of the SOP violated N.J.R.E. 404(b), which provides that "evidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that such person acted in conformity therewith." State v. Skinner, 218 N.J. 496, 512 (2014) (quoting N.J.R.E. 404(b)). The Rule's purpose is "simply to keep from the jury evidence that the defendant is prone to commit crimes or is otherwise a bad person, implying that the jury needn't worry overmuch about the strength of the government's evidence." State v. Santamaria, 236 N.J. 390, 410 (2019) (quoting State v. Rose, 206 N.J. 141, 180 (2011)).

"[B]efore a court determines whether a prior bad act is admissible for a particular purpose authorized by Rule 404(b), it must determine first whether the evidence, in fact, relates to a prior bad act, or whether instead it is intrinsic

to the underlying crime."  Canfield, 470 N.J. Super. at 338.  "Intrinsic evidence is evidence that 'directly proves' the charged offense or evidence of acts performed contemporaneously with the charged crime . . . [that] facilitate the commission of the charged crime.'"  State v. B.A., 458 N.J. Super. 391, 412 (App. Div. 2019) (alteration and omission in original) (quoting Rose, 206 N.J. at 180).  "As such, if evidence is found to be intrinsic to the crime at issue, it does not constitute other-acts evidence and is subject only to the limits of Rule 403."  Santamaria, 236 N.J. at 410.

Here, the State's case rested on the theory that defendant displayed a stolen State Police ID at four different motor vehicle stops to escape receiving traffic tickets.  On the other hand, defendant's case rested on the theory that he did not steal the State Police ID, and he offered his personal business card into evidence to demonstrate the business card was the document he presented to the four police officers.  The State's offering the SOP into evidence rebutted defendant's theory of the case and supported its own theory of the case.  Because defendant conceded his personal business card violated the SOP, the State argued it was more likely defendant displayed his State Police ID to escape receiving summonses for violation of the State's motor vehicle laws.

We are satisfied the judge did not err in admitting the SOP as intrinsic evidence to rebut defendant's evidence that he displayed his personal business card rather than his State Police ID. Therefore, the State was permitted to address the SOP in its summation. Further, defense trial counsel's "failure to object suggests" the defense "did not believe the remarks were prejudicial at the time they were made" and, additionally, "deprive[d] the court of an opportunity to take curative action." State v. Frost, 158 N.J. 76, 84 (1999).

## VI.

Defendant asserts the State improperly elicited lay opinion testimony from Barlow that defendant improperly retained his State Police ID after reporting it lost. We reject this argument.

Because defendant failed to raise this issue at trial, we review for plain error. R. 2:10-2.

Barlow testified for the State during the trial. Barlow told the jury defendant "reported that he lost his issued credit card ID, and it was replaced" prior to his suspension. Barlow explained defendant "turned in" a State Police ID when he was suspended. According to the testimony, sometime after defendant's suspension, Barlow received a "complaint" that defendant was

"presenting a[n] ID after being stopped multiple times for motor vehicle violations."

During Barlow's investigation of the complaint, he sent an email to defendant's attorney. In that email, Barlow explained his belief that defendant "located the initial identification" reported lost "and has it in his possession." Barlow asked defendant's attorney "to inquire . . . if [defendant] would produce the credit card State Police ID." Barlow told the jury:

> What we came to realize was that once he turned over the credit card ID or the wallet ID, he now had a second one, which was inevitably the first one which he reported stolen or missing. So, we knew he was in possession of one. Since he's a — a suspended member of the State Police, he had to turn that back over.

Defense counsel did not object to Barlow's testimony. Instead, counsel attempted to impeach Barlow through cross-examination. On cross-examination, Barlow admitted his investigation failed to determine whether defendant retained his original State Police ID. Barlow reiterated his belief that defendant possessed his State Police ID after being suspended based upon the BWC footage from the motor vehicle stops. According to Barlow, the videos showed defendant displaying something that "resembled a credit card State Police ID." Barlow further testified on cross-examination: he was unaware defendant had a personal business card; having a personal business card was not

39

"improper"; and defendant would not be required surrender his personal business card upon his suspension.

The Rules of Evidence permit lay witnesses to testify "in the form of opinions or inferences if" the testimony "(a) is rationally based on the witness' perception; and (b) will assist in understanding the witness' testimony or determining a fact in issue." N.J.R.E. 701. Lay witnesses may not express "a belief in defendant's guilt." State v. McLean, 205 N.J. 438, 463 (2011). Nor may lay witnesses opine on "matters that were not beyond the understanding of the jury." Ibid.

Here, unlike the facts in McLean, Barlow's testimony was presented in conjunction with the testimony of the four police officers who stopped defendant's car and the BWC or dash-cam footage from those traffic stops. Collectively, this evidence suggested defendant displayed a document that prompted the police officers not to issue tickets to defendant. It was based on this evidence that Barlow suspected defendant retained his original State Police ID.

Moreover, the purpose of this testimony was to prove Barlow notified defendant's attorney, about two months prior to the execution of search warrants for defendant's person, home, and car, that the New Jersey State Police suspected

40

defendant retained possession of his State Police ID after his suspension. Based on Barlow's testimony, the State sought to prove defendant had ample time to discard his improperly retained State Police ID prior to the issuance and execution of those search warrants.

Additionally, defense counsel claimed defendant was unaware search warrants would be issued and, therefore, the failure to find a State Police ID during those searches indicated defendant did not retain his State Police ID. Based on this argument, defendant opened the door to admission of Barlow's testimony.

Having considered the testimony, and contrary to defendant's argument, we conclude Barlow did not definitively opine that defendant improperly retained his State Police ID. Rather, Barlow testified he suspected defendant of a crime and that was the reason for his investigation. Under the totality of the circumstances, we are satisfied Barlow did not offer an unequivocal lay opinion as to defendant's guilt which would have been inadmissible under McLean. Rather, Barlow's testimony responded to defendant's contention he did not know the State Police intended to search his person, home, and car for the missing State Police ID.

VII.

Next, defendant contends the judge erroneously barred his presentation of habit evidence under N.J.R.E. 406. Defendant sought to introduce evidence of other traffic stops during which he offered his personal business card. We reject this argument.

The judge precluded defendant's proffer of testimony from officers who would testify defendant did not present his State Police ID at three traffic stops not charged as part of the indictment. The judge found defendant failed to present any legal authority that those police interactions were admissible and relevant to the charges against defendant in this case because those stops "involv[ed] totally different officers."

We review a trial court's evidentiary rulings for abuse of discretion. State v. Nantambu, 221 N.J. 390, 402 (2015). A "functional approach to abuse of discretion examines whether there are good reasons for an appellate court to defer to the particular decision at issue." R.Y., 242 N.J. at 65 (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)). We review questions of law de novo. State v. J.D., 211 N.J. 344, 354 (2012).

N.J.R.E. 406 provides:

> (a) Evidence, whether corroborated or not, of habit or routine practice is admissible to prove that on a specific

42

occasion a person or organization acted in conformity with the habit or routine practice.

(b) Evidence of specific instances of conduct is admissible to prove habit or routine practice if evidence of a sufficient number of such instances is offered to support a finding of such habit or routine practice.

A habit is a repeated behavioral response to a specific factual stimulus. Sharpe v. Bestop, Inc., 158 N.J. 329, 330 (1999). It is not "a mere tendency to act in a given manner." L.T v. F.M., 438 N.J. Super. 76, 90 (App. Div. 2014). "Habit evidence must, with 'specificity or proof of regularity,' demonstrate a 'routine practice probative of . . . conduct' at the event in question." Ibid. (omission in original) (quoting Riley v. Keenan, 406 N.J. Super. 281, 299-300 (App. Div. 2009)). For habit evidence to be admissible, "the offering party must establish the degree of specificity and frequency of uniform response," demonstrating the conduct "is 'semi-automatic' in nature." Sharpe, 158 N.J. at 331 (quoting Thompson v. Boggs, 33 F.3d 847, 854 (7th Cir. 1994)).

Here, defendant sought to admit his interactions with police during seven separate traffic stops. The sampling of traffic stops was inadequate to establish the degree of specificity and frequency of response necessary to demonstrate defendant's conduct constituted habit or routine practice. On these facts, we are

43

satisfied the judge did not abuse her discretion in precluding defendant's proffered habit evidence.

## VIII.

Defendant argues the judge failed to assign a burden of proof beyond a reasonable doubt regarding the jury's answers on the verdict sheet. Defendant contends the judge failed to advise "the jury that if they have a reasonable doubt on resolution of the 'Yes/No' questions, they should answer, 'No.'" He further asserts the judge's submission of "the elements of a crime in individual 'Yes/No' format" was contrary to Simon, 79 N.J. at 191. We disagree.

## A.

When a defendant objects to a jury charge for the first time on appeal, as defendant did in this case, we review the charge for plain error. Munafo, 222 N.J. at 488. Plain error is one "clearly capable of producing an unjust result." R. 2:10-2.

"In a criminal prosecution, the State bears the burden of proving beyond a reasonable doubt every element of an offense." State v. Medina, 147 N.J. 43, 49 (1996). Trial courts have a duty to impress this quantum of proof upon the jury, and the Court cautions "against using any charge that has a tendency to 'understate[]'" the standard. Id. at 50-51 (omission in original) (quoting State v.

Biegenwald, 106 N.J. 13, 41 (1987)).  When a defendant challenges a jury charge regarding the State's burden of proof, "portions of a charge alleged to be erroneous cannot be dealt with in isolation but the charge should be examined as a whole to determine its overall effect."  State v. Purnell, 126 N.J. 518, 544 (1992) (quoting State v. Marshall, 123 N.J. 1, 135 (1991)).  "Only those instructions that overall lessen the State's burden of proof violate due process." Medina, 147 N.J. at 52.  Where the "overwhelming tenor" "of the court's charge to the jury" conveys "that the State bore the burden of proof beyond a reasonable doubt on each and every element of the case," there is no plain error.  Purnell, 126 N.J. at 543-44.

Here, the judge instructed the jury multiple times throughout the charge that the State bore the burden of proving beyond a reasonable doubt each and every element of the case.  Having reviewed the judge's instructions to the jury, we are satisfied the overwhelming tenor of the jury charge clearly conveyed the State had the burden of proving beyond a reasonable doubt as to each and every element of the counts in the indictment.  Under the circumstances, we discern no error in the judge's jury instruction on this point.

B.

We next consider defendant's challenge to the verdict sheet under <u>Simon</u>.

The verdict sheet separated the official misconduct charge in count two into the

following two-part question:

> 1(a). How do you find with respect to Count Two,
> <u>Official Misconduct</u>, that between on or about
> September 19, 2016 and on or about August 23, 2018,
> the defendant, Marc W. Dennis did commit <u>Official
> Misconduct</u> by knowingly unlawfully taking or
> exercising control over the New Jersey State Police
> Wallet Identification and/or by displaying said State
> Police issued Wallet Identification did improperly
> represent himself to be an active-duty member of the
> New Jersey State Police?
>
> Not Guilty ____          Guilty ____
>
> b. If guilty, answer the following question: Did the
> defendant obtain or seek to obtain, for himself or
> another, a non-pecuniary benefit, or did he seek to
> injure another or deprive another of a benefit?
>
> Yes ____          No ____

The verdict sheet similarly separated the theft by unlawful taking charge

in count five into the following two-part question:

> 1. (a) How do you find with respect to Count Five,
> <u>Theft by Unlawful Taking</u>, that between on or about
> September 16, 2016, and on or about August 23, 2018,
> the defendant, Marc W. Dennis, committed the crime of
> <u>Theft by Unlawful Taking</u> by knowingly unlawfully
> taking or exercising control over the movable property

46

of the State Police that is the New Jersey State Police issued Wallet Identification Card?

> Not Guilty ____          Guilty ____

> If you answered "not guilty" to question 1(a), please proceed to Count 6, question 1.
> If you answered "guilty" to question 1(a), please proceed to question 1(b).

> (b) If guilty, was the property a public writing, record, or instrument? <u>(find one of the following)</u>

> Yes ____          No ____

The facts relevant to the verdict sheet in this case are distinguishable from the facts before the Court in <u>Simon</u>. <u>Simon</u> involved prosecution of the defendant for "conspiracy and other crimes." 79 N.J. at 194. After the defense rested, and before issuing the jury instructions on the "elements of the various offenses" charged, the judge submitted "special interrogatories to the jury." <u>Id.</u> at 197-98. The special interrogatories asked the jury to determine whether the defendant participated in various conspiracies with his co-defendants. <u>Id.</u> at 197. After deliberating for four hours, "the jury returned, answering 'yes' to each question." <u>Id.</u> at 198. Despite the jury's "yes" response to the special interrogatories regarding conspiracy, "[t]he judge proceeded to instruct the jury as to the remaining" crimes by informing the jury not to "assume the existence of any conspiracy." <u>Ibid.</u>

The Simon Court concluded the judge erred by issuing the jury instructions in this manner. Id. at 198. The Court held the use of special interrogatories when issuing jury instructions may not "proselytize the jury to the guilt of a defendant." Id. at 200. The Court noted the "'bifurcated' presentation of the interrogatories" entailed "mental exercises" and "subliminal suggestiveness" that had an "indisputable" effect on the jury's determination "of the main question of the criminal trial, the existence of a criminal conspiracy." Id. at 201.

Here, the judge did not present special interrogatories to the jury before charging the jury as to all counts against defendant. The problem with the jury instruction issued in Simon related to the use of special interrogatories which bifurcated the jury's deliberations. The jury in this case deliberated only after it received the judge's complete jury charge, which explained the elements necessary to find defendant guilty as to each charged offense.

Having found no error in the judge's jury instructions, let alone plain error, we reject defendant's argument on this point.

IX.

Lastly, defendant contends a state-employee identification card does not constitute a writing, record, or instrument warranting modification of his theft

conviction to a disorderly-persons offense rather than a third-degree crime. In arguing the rule of lenity, defendant asserts "[i]t is a hard to believe that the Legislature would have intended that retaining" an ID "at a time when one should technically turn it in . . . is a third-degree crime that could conceivably be the cause of discretionary forfeiture of a state pension." We disagree.

N.J.S.A. 2C:20-2(b)(2)(g) provides that theft is a crime of the third degree if the item stolen was a "public record, writing or instrument." At trial, applying the rules of statutory construction, the judge concluded "unless a statute is vague the [c]ourt is to give it it[]s plain meaning." The judge stated the Criminal Code defined for the term "writing." She also determined various legal dictionaries defined the terms "public record" and "instrument," and those definitions were appropriate to recite as part of the jury instructions. Counsel did not object to the judge's proposed instruction in this regard.

Ultimately, the verdict sheet asked the jury to determine whether a State Police ID was "a public writing, record, or instrument." The jury found a State Police ID satisfied the elements under N.J.S.A. 2C:20-2(b)(2)(g) to constitute theft in the third-degree.

Under the rule of lenity, "when interpreting a criminal statute, ambiguities that cannot be resolved by either the statute's text or extrinsic aids must be

resolved in favor of the defendant." State v. Gelman, 195 N.J. 475, 482 (2008). The rule recognizes "an accused is entitled to 'fair warning . . . of what the law intends to do if a certain line is passed.'" State v. D.G.M., 439 N.J. Super. 630, 641 (App. Div. 2015) (quoting McBoyle v. United States, 283 U.S. 25, 27 (1931)).

Contrary to the State's argument, the rule of lenity is not limited to the elements of an offense. In Gelman, the Court applied the rule to "the grading provision of" a criminal statute the same as requested by defendant in this matter. 195 N.J. at 483-88.

Here, the jury found defendant, a member of law enforcement sworn to uphold the law, improperly retained his State Police ID after being suspended from his job. Defendant, on several occasions, then displayed his improperly retained State Police ID to avoid receiving tickets for motor vehicle violations.

Under the wording of the statute, defendant impermissibly retained a public record, writing, or instrument after being suspended from his law enforcement position. The jury found defendant subsequently used that public record, writing, or instrument to avoid tickets for violating the State's motor vehicle laws. As a law enforcement officer, defendant was well aware of the rules of the road which he nonetheless violated. Under these circumstances, the

jury found defendant acted in dereliction of his duties as a law enforcement officer, warranting the discretionary forfeiture of his State pension for conduct constituting a third-degree crime.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-2755-22